# EXHIBIT B

E-FILED; Baltimore City Circuit Court
Docket: 4/3/2025 9:26 AM; Submission: 4/3/2025 9:26 AM
Envelope: 20639159

## IN THE CIRCUIT COURT FOR
## BALTIMORE CITY

| | |
|---|---|
| CITY OF BALTIMORE, *ex rel.* Ebony Thompson, <br><br> *Plaintiff*, <br><br> v. <br><br> DRAFTKINGS INC., a Nevada corporation, and FLUTTER ENTERTAINMENT PLC d/b/a FANDUEL INC., an Irish corporation, <br><br> *Defendants*. | Case No.  C-24-CV-25-002683 <br><br><br> JURY TRIAL DEMANDED <br><br><br> C-24-CV-2 |

## COMPLAINT

Plaintiff, the Mayor and City Council of Baltimore ("Baltimore" or "the City"), by Ebony Thompson of the Baltimore City Law Department ("Plaintiff"), brings this action against DraftKings Inc. ("DraftKings") and Flutter Entertainment plc d/b/a FanDuel Inc. ("FanDuel," together with DraftKings, "Defendants"), seeking civil penalties and injunctive relief to remedy Defendants' violations of the City of Baltimore's Consumer Protection Ordinance, Baltimore City Code Art. 2, § 4 ("CPO").

Baltimore alleges the following based on knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.    In the short period since it legalized online sports betting in 2021, through the passage and signing of HB0940,[1] Maryland has become a sizable sports betting market that continues to grow.

2.    Marylanders wagered more than $5 billion in fiscal year 2024 (July 1, 2023 to June 30, 2024) and $3.7 billion in the first half of fiscal year 2025.[2] Many of those bettors are in Baltimore, by far Maryland's largest city.

3.    While the Maryland online sports betting market is still developing, two sportsbooks, FanDuel and DraftKings, have consistently led the pack. In January 2025 alone, Maryland bettors placed more than $457 million in combined bets on the two platforms, with $278.5 million wagered on FanDuel and $178.9 million wagered on DraftKings. Their closest competitor, BetMGM, took in just $51 million in bets that month.[3]

4.    But rather than accept a robust and profitable market, DraftKings and

---

[1] Maryland General Assembly, *HB0940 Legislative History*, available at: https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/hb0940?ys=2021RS (last accessed March 11, 2025).

[2] Sports Betting Dime, *Maryland Sports Betting Contributes Millions in Tax Revenue for FY 2024*, available at: https://www.sportsbettingdime.com/news/betting/maryland-sports-betting-contributes-millions-in-taxes-in-fy-2024/ (last accessed March 11, 2025); Maryland Lottery and Gaming Control Agency, *Sports Wagering Revenue Reports*, available at: https://www.mdgaming.com/maryland-sports-wagering/revenue-reports/ (last accessed March 11, 2025).

[3] Covers, *Maryland Sports Betting Operators Enjoy Strong January*, available at: https://www.covers.com/industry/maryland-sports-betting-operators-enjoy-strong-january-feb-13-2025 (last accessed March 11, 2025).

FanDuel have sought to guarantee their profitability by cheating, hoping to hook, and then ultimately exploit, as many users as possible.

5.      First, Defendants get Baltimoreans in the door with the promise of "bonus bets," or other similarly named promotions, designed to induce Baltimoreans to bet.

6.      Their goal is twofold: (a) to get as many people to join their platforms as possible; and (b) to use inducements and the design of their product to hook those new users on gambling.

7.      For example, as of March 11, 2025, DraftKings had a promotion of $150 in "bonus bets" for new users, with that "bonus" coming in the form of six separate $25 "bonus bets" that must be used within seven days of sign up.[4] FanDuel currently has a similar promotion: $150 in bonus bets that must be used, in increments, within seven days.[5] In addition to giving the misleading illusion that gambling is not risky, these "bonus bets" help ensure new users bet *often* as soon as they join the platform. Defendants are not interested in people merely dipping their toes in the water: they want bettors to bet, in significant amounts, over and over.

8.      Some get hooked, and that's the point. Defendants will relentlessly ping

---

[4] DRAFTKINGS, *Reward Center – Promos*, accessible at: https://sportsbook.draftkings.com/promos (last accessed March 11, 2025).

[5] Cole Rush, R.J. White, *Best Sportsbook Promotions*, CBS SPORTS, accessible at: https://www.cbssports.com/betting/promos/ (last accessed March 11, 2025).

their users to bet and bet often, with compulsive gambling an inevitable result. Indeed, recent reporting has shown that mobile gaming platforms purposefully tweak their algorithms to **target** those likely to have gambling disorders and extract what the companies euphemistically refer to as "maximum potential revenue" or "lifetime total value" from each user over time. So-called VIP programs are used to personalize the inducements to gamble, and proprietary algorithms help identify just the kind of push-notification that is most likely to induce the next bet. The platforms are designed to create disordered gamblers and then exploit them.

9.    Indeed, reporting has shown that Defendants collect troves of user data, with one internet gaming company, owned by FanDuel's parent company Flutter, documented to have collected at least 186 attributes for each bettor, including their propensity to gamble and susceptibility to marketing. Defendants leverage such data to: (a) identify those who they can hook; (b) hook them; and then (c) keep them betting.[6] Once they've successfully created and/or identified a disordered gambler, Defendants go right to work exploiting them. Defendants' targeting of the vulnerable is so widely known that professional gamblers have taken to purposefully mimicking the behavior of those with a gambling disorder—e.g., by programming bots to open their mobile applications in the middle of the night, as though the users simply

---

[6] Luke Goldstein, *Rollups: The Big Data Machine Driving Online Sports Betting*, THE AMERICAN PROSPECT (Apr. 4, 2022), https://prospect.org/power/rollups-big-data-machine-driving-online-sports-betting/ (last accessed March 11, 2025).

cannot help but wake up to check their bets—to encourage Defendants to provide rewards designed to keep people using the betting application.[7]

10.     Harrowing accounts proliferate in which people describe feeling targeted and exploited by FanDuel and DraftKings, even after they tell representatives from the companies that they fear they are losing control and cannot, for example, pay their mortgage.[8]

11.     Baltimore has been no exception. Mary Drexler, the program director at Baltimore's University of Maryland Center of Excellence on Problem Gambling, publicly warned that staff members of the gambling hotline have been "noticing a disturbing trend. . . . We are starting to see more calls from college-age males and their parents. . . . As the industry booms, problem gambling is growing too, especially among 18- to 24-year-old men who grew up loving sports—and their phones—and can't restrain their mobile sports betting impulses."[9]

---

[7] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts*, HOW GAMBLING WORKS, available at: https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (Sept. 10, 2024) (last accessed March 11, 2025).

[8] *Infra*, Jason Quick, *'I literally can't stop.' The descent of a modern sports fan*, THE ATHLETIC (Oct. 14, 2024), https://www.nytimes.com/athletic/5777632/2024/10/14/sports-betting-addiction-problem-fans/, (last accessed March 11, 2025); Kate Linebaugh, *How a Psychiatrist Lost $400,000 on Gambling Apps*, WALL STREET JOURNAL, (Mar. 15, 2024) https://www.wsj.com/podcasts/the-journal/how-a-psychiatrist-lost-400000-on-gambling-apps/c91168e8-8add-48bc-8f5f-324fe4680df6 (last accessed March 11, 2025).

[9] Jeff Barker, *As problem gambling rises, revenue-focused regulators resist Maryland reforms; 'Warning signs are flashing,'* THE BALTIMORE SUN (Feb. 14, 2025), available at: https://www.baltimoresun.com/2025/02/14/problem-gambling-maryland-regulators-sportsbooks/?share=r2aanawnsm0ttu2sb4yr (last accessed March 11, 2025).

12.    Academic studies have explained that Defendants *could* use the data they have on their customers to identify those who should be cut off,[10] or to create push notifications to encourage responsible behavior,[11] and, in other markets (such as the United Kingdom), some companies (including an affiliate of Defendant FanDuel) do exactly that.

13.    What Defendants are doing in Baltimore City, however, is the opposite—they use creative, algorithmically-crafted, inducements to keep people in the game, even when it is clear the game is causing those users serious harm.

14.    This is no small matter: those with gambling disorders have higher rates of suicidal ideation than even those struggling with other forms of addiction, and are often the perpetrators and victims of domestic violence.[12] This is particularly troubling, considering that a localized prevalence study, conducted in 2022, found that approximately 8.6% of Maryland adults had experienced disordered gambling in their lifetime.[13]

---

[10]    *See, generally*, G. Drosatos, F. Nalbadis, E. Baines, *et al.*, *Enabling Responsible Online Gambling by Real-time Persuasive Technologies*, 17 Complex Systems Informatics and Modeling Quarterly 44 (2018).

[11] *Id.*

[12] The Maryland Center of Excellence on Problem Gambling, *Problem Gambling and Domestic Violence*, available at: https://www.mdproblemgambling.com/problem-gambling-domestic-violence/ (last accessed March 11, 2025).

[13] OFFICE OF PROGRAM EVALUATION AND GOVERNMENT ACCOUNTABILITY, *Evaluation of the Center of Excellence on Problem Gambling* (Jul. 2023), https://dls.maryland.gov/pubs/prod/ProgEval/EvaloftheCenterofExcellenceonProblemGambling.pdf (last accessed March 11, 2025).

15.    Because of Defendants, it is only getting worse. As one member of the Maryland House of Delegates put it, "[w]arning signs are flashing."[14]

16.    Baltimore law is clear: pursuant to Baltimore City Code Art. 2, § 4, it is illegal for companies like Defendants to use unfair, abusive, or deceptive trade practices. FanDuel and DraftKings hook users and then use troves of user data to identify, target, and exploit the most vulnerable among them, specifically seeking those who appear to have gambling disorders. Defendants' actions are unfair, deceptive, abusive, willful, against public policy, and prohibited by law.

## II.    JURISDICTION

17.    This Court has personal jurisdiction over Defendants. Defendants applied for licenses from the Maryland Sports Wagering Application Review Commission ("SWARC") and have advertised continuously in the State of Maryland and the City of Baltimore since their platforms have gone live, and, consequently, they have willfully placed their sports gambling platforms into the stream of commerce. They did so with the knowledge and intent that their products would be widely disseminated in the State of Maryland and the City of Baltimore, and with further knowledge that the adverse effects of their pernicious targeting of

---

[14] Jeff Barker, *As problem gambling rises, revenue-focused regulators resist Maryland reforms: 'Warning signs are flashing,'* THE BALTIMORE SUN (Feb. 14, 2025), available at: https://www.baltimoresun.com/2025/02/14/problem-gambling-maryland-regulators-sportsbooks/?share=r2aanawnsm0ttu2sb4yr (last accessed March 11, 2025).

pathological gamblers would be felt in the State of Maryland and in the City of Baltimore.

18.    By advertising their sports gambling platforms in the State of Maryland and the City of Baltimore and applying for licenses to operate in Maryland from SWARC,[15] Defendants have purposefully availed themselves, through specific acts, of the privilege of conducting activities within the State of Maryland and have conducted illegal acts within the State of Maryland and the City of Baltimore. *See CSR, Ltd. v. Taylor*, 411 Md. 457, 485−86 (Md. Ct. App. 2009) (noting that to satisfy the purposeful availment requirement in Maryland, the defendant must have "engage[d] in significant activities in the State or create[d] continuing obligations with the State's residents, thus taking advantage of the benefits and protections of Maryland law. Examples of such availment include advertising in the forum state and registering to provide services to Maryland residents.) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475−76 (1985); *Asahi Metal Industry Co., Ltd. v. Superior Ct. of Cal., Solano County*, 480 U.S. 102, 112 (1987); *Mohamed v. Michael*, 279 Md. 653, 659 (Md. Ct. App. 1977)).

19.    Defendants are, therefore, subject to the specific personal jurisdiction

---

[15] Robert Linnehan, *First 10 licenses approved as Maryland online sports betting hopeful to launch next week*, SATURDAY TRADITION (2023), available at: https://saturdaytradition.com/sports-gambling/first-10-licenses-approved-as-maryland-online-sports-betting-hopeful-to-launch-next-week/ (last accessed March 11, 2025).

of the courts of this State. Md. Code Ann. § 6-103 ("A court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply goods, food, services, or manufactured products in the State; (3) Causes tortious injury in the State by an act or omission in the State[.]").

20.    This Court's exercise of personal jurisdiction over Defendants is consistent with due process, as Defendants purposefully directed their sports gambling platforms into the State of Maryland and the City of Baltimore and otherwise availed themselves of the benefits and protections of the laws of the State of Maryland and the City of Baltimore.

21.    This Court has subject matter jurisdiction because the claims at issue arise under a City of Baltimore ordinance. Md. Code Ann. § 1-501 ("The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil. . . cases within its county[.]").

### III.    VENUE

22.    Venue is proper in this Court under Md. Code Ann. § 6-201, because a substantial part of the acts or omissions giving rise to the claims occurred in the City of Baltimore and Baltimore County. Md. Code Ann. § 6-201 ("[A] civil action shall be brought in a county where the defendant. . . carries on a regular business[.]").

## IV.   THE PARTIES

### A.   Plaintiff

23.    Plaintiff is the Mayor and City Council of Baltimore, by Ebony Thompson, the City Solicitor of the Baltimore City Law Department, who has the statutory authority to enforce laws for the protection of the public. Baltimore City Code Art. 7, §§ 22–24.

### B.   Defendants

24.    Defendant DraftKings is a Nevada corporation, with its principal place of business at 222 Berkeley Street, 5th Floor, Boston, Massachusetts 02116.

25.    Defendant FanDuel, headquartered at 300 Park Avenue South, 14th Floor, New York, New York 10010, is a wholly owned subsidiary of Flutter Entertainment plc, an Irish corporation, with its principal place of business at Belfield Office Park, Beech Hill Road, Clonskeagh, Dublin 4, Ireland.

## V.   FACTUAL ALLEGATIONS

### A.   Defendants Know That Online Sports Gambling Is Highly Addictive

26.    As Derek Webb, Head of the Campaign for Fairer Gambling put it: "You put the most addictive behavior on the most addictive device . . . . What could go wrong?"[16]

---

[16] Adam Kilgore, *On betting's biggest day, a new scandal puts the sports world on edge*, WASHINGTON POST, available at: https://www.washingtonpost.com/sports/2024/03/21/sports-betting-ohtani-scandal/ (last accessed March 26, 2025).

27.    Indeed, for as long as there has been online gambling, studies have shown it to be particularly addictive. In 2009, Kathryn LaTour, a professor at the University of Nevada Las Vegas, and June Cotte, a professor at the University of Western Ontario, authored a study entitled *Blackjack in the Kitchen: Understanding Online Versus Casino Gambling*. The study, one of the first to compare online gambling with traditional, in-person casino gambling, found that online gamblers gambled more frequently and aggressively than their in-person counterparts and that their behaviors were more indicative of addiction. As the authors explained, decoupling gambling from a designated physical space removes some of the safeguards that exist in in-person gambling:

> When gambling consumption moves into the home, gambling behavior becomes a part of everyday living. When not seen as reserved solely as behavior for an outing or a special occasion, we found that gambling is more likely to become a pernicious, insidiously integrated component of a consumer's life. Online gambling can happen without the knowledge of nongambling significant others (spouse, parents). It can be done away from their gaze and their censure. One can also sneak out to a casino too, but it is harder to hide this behavior. . . . [17]

28.    It is thus utterly unsurprising that with the expansion of online gambling, addiction is on the rise.[18]

---

[17] June Cotte & Kathryn A. LaTour, *Blackjack in the Kitchen: Understanding Online versus Casino Gambling*, 35 J. of Consumer Research 742, 755 (Feb. 2009).

[18] Yeola A, Allen MR, Desai N, *et al.*, Growing Health Concern Regarding Gambling Addiction in the Age of Sportsbooks. *JAMA Intern Med.* (Feb. 17, 2025), available at: https://doi:10.1001/jamainternmed.2024.8193 (last accessed March 11, 2025).

29.    The problem is particularly acute for young people; a 2012 study of university students found that, among students who had gambled on the internet, 16.2% of those students met the criteria for "problem gamblers" under the DSM-IV.[19]

30.    The problem is also apparent, and growing, within the general population; a 2021 report from the National Council on Problem Gambling found that 11% of those surveyed displayed signs of "problematic behaviors" relating to gambling, a 50% increase from 2018.[20] According to another survey, among monthly gamblers, those experiencing gambling problems jumped from 12.7% in 2014 to 25.6% in 2023.[21] Another recent report indicated that nearly one in ten adults who use online sports betting products have a gambling disorder.[22]

31.    On February 17, 2025, NBC News reported that there have been dramatic increases in online searches for terms like "gambling addiction hotline"

---

[19] Jessica McBride & Jeffrey Derevensky, *Internet gambling and risk-taking among students: An exploratory study*, 1 J. of Behavioral Addictions 50 (Jun. 1, 2012).

[20] NATIONAL COUNCIL ON PROBLEM GAMBLING, *National Survey on Gambling Attitudes and Gambling Experiences 2.0 (2021)*, https://www.ncpgsurvey.org/ngage-2021/ (last accessed March 11, 2025).

[21] UNIVERSITY OF MASSACHUSETTS AMHERST SCHOOL OF PUBLIC HEALTH & HEALTH SCIENCES, *Problem Gambling May Be on the Rise Among Monthly Gamblers in Massachusetts, Online Surveys Suggest* (Sept. 3, 2024), https://www.umass.edu/public-health-sciences/news/problem-gambling-may-be-rise (last accessed March 11, 2025).

[22] NBC News, *Online gambling has fueled an industry boom that threatens public health, commission finds* (Feb. 24, 2024), available at: https://www.nbcnews.com/health/health-news/gambling-industry-growth-threat-public-health-report-rcna175356 (last accessed March 11, 2025).

and "am I a gambling addict," with surges in these searches strongly correlated with the opening of new sportsbooks, like DraftKings and FanDuel, in states that legalized sports gambling.[23] As United States Senator Richard Blumenthal put it, "[t]he growing legalization of sports betting coupled with the ability to place bets from your phone whenever you want have created the perfect storm for gambling addiction—resulting in a severe public health crisis."[24]

32.    In Maryland, those who participate in online sports betting are significantly more likely to exhibit disordered gambling behaviors than those who participate in sports betting through traditional, in-person means. According to the University of Maryland's Center of Excellence on Problem Gambling, while 11.3% of Marylanders who participated in "traditional" sports betting showed signs of disordered gambling, nearly double—20.8%—of online sports bettors showed signs of disordered gambling.[25]

33.    The rise of problematic gambling behavior, exacerbated by online platforms, is even more concerning when one considers that those who

---

[23] Erik Ortiz, *Online Searches for Gambling Addiction Surge as Legalized Sports Betting Expands, Study Finds*, NBC NEWS (Feb. 17, 2025), available at: https://www.nbcnews.com/health/health-news/online-searches-gambling-addiction-surge-legalized-sports-betting-expa-rcna192462 (last accessed March 11, 2025).

[24] *Id.*

[25] MARYLAND CENTER OF EXCELLENCE ON PROBLEM GAMBLING, *Understand the Risks*, available at: https://www.mdproblemgambling.com/sports-betting-2/understand-the-risks/ (last accessed March 11, 2025).

pathologically gamble represent a primary profit center for online gambling platforms. In the United Kingdom, one report from the House of Lords found that 60% of the online gaming industry's profits came from just 5% of its customers.[26] Moreover, online gambling platforms have built their businesses on people with addictions who will spend substantially more time and money gambling than the general population, and target these people to extract as much from them as they can without regard for their well-being or safety.

34.    A core trait of gambling disorder is severely diminished impulse control, which prevents those gamblers from being able to stop a behavior once they start. As explained in the article *Reactive and proactive control mechanisms of response inhibition in gambling disorder*, published in Psychiatry Research (February 2019):

> Response inhibition, one component of cognitive control, refers to the ability to inhibit automatic responses and has been found to be impaired in gambling disorder. Recent models of cognitive control distinguish between two mechanisms: reactive control, the ability to stop in response to a stop-stimulus, and proactive control, the ability to anticipate and prepare for a stop. . . [P]remediation, one domain of trait impulsivity, was associated with worse proactive control in the gambling group.[27]

---

[26] Luke Goldstein, *Rollups: The Big Data Machine Driving Online Sports Betting*, THE AMERICAN PROSPECT (Apr. 4, 2022), https://prospect.org/power/rollups-big-data-machine-driving-online-sports-betting/ (last accessed March 11, 2025).

[27] Sharif-Razi, Maryam, *et al.* "Reactive and proactive control mechanisms of response inhibition in gambling disorder." Psychiatry research vol. 272 (2019): 114-121, available at: https:/doi:10.1016/j.psychres.2018.12.049 (last accessed March 11, 2025).

35.    This trait both explains the substantial frequency and volume of bets placed by those with gambling disorders and why those with gambling disorders are such attractive targets to sports betting platforms—if they are inclined to stop betting, that inclination can be easily overridden by sending them a positive inducement to continue, even if such an inducement would not be sufficient to get a non-disordered person to resume gambling.

36.    This is all common knowledge within the industry. Despite the inherent danger in the product that they are offering, DraftKings and FanDuel continue to target known problem gamblers with promotions and incentives, effectively placing temptation in front of those least able to resist it.

37.    The reason for DraftKings' and FanDuel's strategy is simple: they want to maximize the "customer lifetime value" ("CLV") or "lifetime value" ("LTV") for each and every customer.[28]

38.    DraftKings and FanDuel structure their approach around aggressively promoting their platforms with promotional offers, then maximizing the lifetime value through acquiring customers efficiently and then retaining/monetizing existing customers, including, and especially by, inducing those with gambling problems to make bad bets.[29]

---

[28] The terms are used interchangeably in this complaint.

[29] PYMNTS, *DraftKings Customer-Centric Strategy Avoids Mention of Any Specific Digital Innovations* (Nov. 3, 2023), available at: https://www.pymnts.com/earnings/2023/draftkings-

39.    As DraftKings CEO Jason Robins explained in November 2023, "We're very focused on the customer and on maximizing the LTV (lifetime value)."[30] Robins also openly admitted that DraftKings is only interested in serving bettors who will lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[31]

40.    As early as May 2022, Peter Jackson, CEO of FanDuel's parent company, Flutter, confirmed a similar tactic: "We are continuing to push hard on driving some customer acquisitions and we're very, very pleased with the acquisition costs that we're seeing and the lifetime value dynamics that we're also seeing. . . It's giving us real conviction and we're leaning in very heavily to acquire as much business as we can."[32]

41.    Currently, DraftKings and FanDuel command approximately 70% market share in U.S. online sports betting, evidencing that their approaches to extracting CLV is a major factor in their market dominance.[33]

---

customer-centric-strategy-avoids-mention-of-any-specific-digital-innovations    (last    accessed March 11, 2025).

[30] *Id.*

[31] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE (Nov. 17, 2024), available at: https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last accessed March 11, 2025).

[32] *Legal Sports Report, FanDuel Continues Aggressive Acquisition Push As Others Slow Down* (May 5, 2022), *available at:* https://www.legalsportsreport.com/69377/fanduel-continues-aggressive-acquisition-push-as-others-slow-down/ (last accessed March 11, 2025).

[33] Robert Heard, *The Hidden Moat: How Early Customer Acquisition Shaped Industry Leaders in Video Streaming and Sports Betting*, LINKEDIN (Aug. 26, 2024),    available at:

42.    DraftKings and FanDuel's early data advantage creates a "virtuous cycle" where deeper customer insights enable better personalization and engagement, "keep[ing] users coming back," leading to higher retention and CLV.[34]

## B.    DraftKings And FanDuel Maximize Value By Targeting Those With Gambling Disorders

### 1.    Getting Bettors In the Door

43.    The first step in Defendants' scheme is to induce new users to bet and bet often.

44.    DraftKings and FanDuel each employ strategic promotional campaigns to attract and identify potential regular users. These promotions have historically featured first deposit matching up to $1,000 and were initially called "Risk-Free" bets. Following negative press attention, these initial inducements were rebranded to "No Sweat" bets, "Bonus Bets," or something similar.[35]

45.    As of March 2025, both DraftKings and FanDuel continue to employ similar promotions, where a $5 bet by a new user will unlock $150 in "bonus bets."[36]

46.    The fine print reveals, however, that "bonus bets" must be used within

---

https://www.linkedin.com/pulse/hidden-moat-how-early-customer-acquisition-shaped-industry-rob-sheard-iyu3e (last accessed March 11, 2025).

[34] *Id.*

[35] *See e.g.,* DRAFTKINGS, *Welcome Page,* available at: www.draftkings.com (last accessed March 11, 2025); FANDUEL, *Welcome Page,* available at: www.fanduel.com (last accessed March 11, 2025).

[36] *See id.; see also* **Figure 1**.

seven days, and can only be made in increments up to $25.[37] In other words, to get the full $150 in bonus bets, a user would have to bet frequently—at least six times over the first seven days of signing up. This promotion structure is designed to encourage new bettors to gamble daily, and not merely occasionally as a social activity.

47.    Notably, while these offers appear straightforward to a person reading the large, prominent advertising text, they are governed by complex terms and conditions.[38] These terms are presented in small print and through hyperlinks that often become visible only at the point of opt-in. For example, in the promotion presented in **Figure 1**, found on DraftKings' website, terms and conditions do not appear until clicked.

48.    These offers contain intricate rules that many users may find difficult to fully comprehend. For example, DraftKings' fine print explains that generally only the prize amount of a bonus bet will be returned to a wallet (not the original betting amount as well, as would be typical for a regular bet), and bonus bets are often unavailable for certain types of bets, such as teasers.[39] FanDuel explains in the

---

[37] *Id.*

[38] *Id.*

[39]    *Id.*;    *see    also,*    DraftKings,    *Bonus    Bets    and    Promotions,*    available    at: https://sportsbook.draftkings.com/help/bonusbets-and-promotions/bonusbets-and-promotions (last accessed March 11, 2025).



Figure 1 – Example of a Promotional Offer on
DraftKings as of February 2025

fine print that FanDuel Bonus Bets expire in seven days unless otherwise noted, and

that the "cashing out option is disabled when the wager is placed with a bonus bet."[40]

49.     Sometimes, Defendants offer "deposit bonuses"—meant to even more

closely mimic real cash. As DraftKings states regarding *those* promotions in the fine

print: "You'll play through your contributed money before using your bonus money"

and "[e]ach bonus is different, so be sure to check the individual bonus rules…."[41]

50.     Again, the rules governing these promotions are not apparent on the

face of the advertisements promoting them. The deceptiveness is meant to ease

friction and to get as many new customers "in the door" as possible—if DraftKings

and FanDuel were more transparent about the rules and conditions of their

---

[40] FanDuel, *Bonus Bets*, available at: https://support.fanduel.com/s/article/Bonus-Bets (last
accessed March 11, 2025).

[41] DraftKings, *Bonus Bets and Promotions*, available at:
https://sportsbook.draftkings.com/help/bonusbets-and-promotions/bonusbets-and-promotions
(last accessed March 11, 2025).

promotions, far fewer people would opt into them.

51.    These marketing tactics serve two purposes. First, they encourage individuals to create and fund accounts on a platform. After accounts are initially created and funded, individuals can then seamlessly transfer additional "real" money onto the platform. Second, the marketing tactics prompt users to place larger and more frequent wagers than they might have initially intended when considering their personal limits on reasonable betting, by implanting the false idea that users are obtaining "free bets," or otherwise taking on substantially less financial risk than they actually are. Such a strategy may be particularly effective when the customers are those with gambling disorders, who have lower impulse control.[42]

52.    Defendants understand that their initial investment in acquiring customers can yield significant returns. As McKinsey partner Dan Singer explains, "[w]hen a market opens up, you need to get out there and start acquiring [bettors], because being the first book that someone downloads gives you nearly twice the engagement as being the second or third."[43]

53.    Initially, DraftKings and FanDuel would fulfill their promotional promises of cash deposit matches and "Risk-Free" bets by providing cash refunds

---

[42] *Supra*, fn. 26.

[43] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, (Sept. 27, 2022), available at: https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials (last accessed March 11, 2025).

for losses. However, this approach led to significant financial costs as they expanded into new markets. As the *Washington Post* explained, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[44]

### 2.    Keeping the Bettors: Leveraging Big Data

54.    After attracting users with these promotional offers, Defendants implement sophisticated user-tracking systems employing LTV calculations.

55.    This process involves comprehensive data collection across various behavioral metrics, allowing Defendants to understand and analyze user behavior in detail. DraftKings and FanDuel track, among other things, "the total income a business can expect from a typical customer during his/her Lifetime" through metrics including betting frequency, average bet size, and length of customer relationship.[45] These are considered foundational LTV metrics, meant to aid DraftKings and FanDuel in calculating the average revenue per user by the customer's lifespan.[46]

---

[44] *Id.*

[45] BETCONSTRUCT, *LTV (CLV) in Gambling: Use it to Your Advantage*, available at: https://www.betconstruct.com/product-blog/ltv-in-gambling (last accessed March 11, 2025).

[46] Robert Heard, *The Hidden Moat: How Early Customer Acquisition Shaped Industry Leaders in Video Streaming and Sports Betting*, LINKEDIN (Aug. 26, 2024),    available at:

56.   DraftKings and FanDuel then layer in advanced identification techniques, including predictive modeling using machine learning algorithms and discounted cash flow analysis to forecast future value and profitability.[47] After employing those methods, the companies create "engagement techniques"—such as carefully tailored push notifications or "bonus bets"—to keep users spending.

57.   All of this serves to create a dynamic system, supported by highly sophisticated and proprietary computer algorithms, for Defendants to identify their most valuable players and optimizing retention strategies—the "Maximized LTV."[48]

58.   As one industry publication put it, "measuring LTV in an online casino is a dynamic and ongoing process that requires understanding player behavior, accurately tracking revenue, and applying advanced models to predict future value."[49] This sophisticated approach to LTV measurement enables operators to make data-driven decisions about marketing spend and personalized retention tactics.[50]

59.   Perversely, the metrics used to calculate LTV in sports betting—betting

---

https://www.linkedin.com/pulse/hidden-moat-how-early-customer-acquisition-shaped-industry-rob-sheard-iyu3e (last accessed March 11, 2025).

[47] *Id.*

[48] *Id.*

[49] GR8 TECH, *How Understanding LTV Ensures the House Always Wins*, available at: https://gr8.tech/blog/how-understanding-ltv-ensures-the-house-always-wins (last accessed March 11, 2025).

[50] *Id.*

frequency/volume, bet size, time spent betting, response to losses—closely mirror established indicators of gambling addiction.[51] Betting frequency and volume, tracked as total bets and bets/rounds per player, directly correspond to the diagnostic criterion of increased gambling frequency.[52] Average bet size, which is significantly larger for prime customers, mirrors the addiction indicator of needing to bet more money to achieve desired excitement levels.[53] Time spent gambling, measured by operators as session length and frequency, correlates with the addiction warning sign of spending increasing amounts of time gambling.[54]

60.    Even more troubling is DraftKings' and FanDuel's tracking of "loss chase behavior." Upon information and belief, they both monitor the aforementioned metrics and deposit patterns following losses to identify "engaged" players,[55] even though returning to recover losses, sometimes called "loss chasing," is a classic sign of problem gambling. Response to promotions, which operators use to measure

---

[51] DSM-5, Diagnostic Criteria: Gambling Disorder, available at: https://portal.ct.gov/-/media/dmhas/pgs/dsmdiagnosispdf.pdf (last accessed March 11, 2025).

[52] EVERY MATRIX, *Key Performance Indicators for Your iGaming Business*, available at: https://everymatrix.com/gambling-business-key-performance-indicators (last accessed March 11, 2025).

[53] *See e.g.,* Watson, Lisa and Sudhir H. Kale, *Know When to Hold Them: Applying the Customer Lifetime Value Concept to Casino Table Gaming,* International Gambling Studies, vol. 3, no. 1, June 2003, pp. 89–101; *see also,* DSM-5, Diagnostic Criteria: Gambling Disorder, available at: https://portal.ct.gov/-/media/dmhas/pgs/dsmdiagnosispdf.pdf (last accessed March 11, 2025).

[54] *Id.*

[55] EVERY MATRIX, *Key Performance Indicators for Your iGaming Business*, available at: https://everymatrix.com/gambling-business-key-performance-indicators (last accessed March 11, 2025).

marketing effectiveness, indicate vulnerability to gambling triggers and cues.

61.    By contrast, mobile sports betting companies, including Defendants FanDuel and DraftKings, will purposefully *exclude* and limit those whom they identify as professionals—*i.e.*, those who are too good at gambling—even if they gamble frequently.[56] The choice to exclude the sophisticated, savvy, and non-pathological gambler—the gambler least likely to be driven by impulse to their detriment—while affirmatively including and encouraging the disordered, pathological gambler most likely to jeopardize their well-being and safety in order to gamble more, is emblematic of Defendants' abusive conduct.

### 3.    Identifying And Exploiting Problem Gamblers

62.    DraftKings and FanDuel are not content merely to expand gameplay: they employ sophisticated data analytics to identify and then exploit players showing signs of problem gambling.

### (a)    Loyalty/VIP Programs

63.    One strategy that both Defendants use to customize their exploitation of users is the "VIP Program." Defendants both boast that their VIP programs provide access to exclusive offers and bonuses, in addition to access to a personal

---

[56] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST (Sept. 27, 2022), available at: https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials (last accessed March 11, 2025).

"VIP Host" (DraftKings) or "Account Manager" (FanDuel).[57]

64.    Upon information and belief, the companies' loyalty programs are substantially similar to one another.

65.    DraftKings operates a "Dynasty Rewards" loyalty program with tiered membership levels ranging from Bronze, Silver, Gold, Diamond, and Onyx, with the highest "Onyx" tier being invite-only and requiring a minimum of 175,000 "tier credits." At the Gold and Onyx level, members access "VIP Hosts" which can provide tailored promotions, credits, and rewards to the most active of gamblers.[58] Members at all levels earn "Crowns" and "Tier Credits" through their betting activity, which can be redeemed for site credits, gift cards, and other rewards.[59] The program promises increasingly valuable benefits, promotions, and gifts as users advance to higher tiers (by betting more), with tier status lasting through the end of the current calendar year and the entire following year once achieved.[60] Because tier

---

[57] DRAFTKINGS, *Roll Like Royalty*, available at: https://sportsbook.draftkings.com/sportsbook-vip (last accessed March 11, 2025) (offering qualified VIPs, among other things, "Exclusive Custom Offers"); FANDUEL, *VIP EXPERIENCE*, available at: https://www.fanduel.com/vip (last accessed March 11, 2025) (offering VIPs "exclusive promotions & bonuses").

[58] *See infra*, Kate Linebaugh, *How a Psychiatrist Lost $400,000 on Gambling Apps*, WALL STREET JOURNAL, (Mar. 15, 2024) https://www.wsj.com/podcasts/the-journal/how-a-psychiatrist-lost-400000-on-gambling-apps/c91168e8-8add-48bc-8f5f-324fe4680df6 (last accessed March 11, 2025); DRAFTKINGS, *Dynasty Rewards*, available at: https://www.draftkings.com/dynasty-home (last accessed March 11, 2025).

[59] DRAFTKINGS, *Dynasty Rewards*, available at: https://www.draftkings.com/dynasty-home (last accessed March 11, 2025).

[60] *Id.*

status is not permanent, users must continue gambling at a high rate on the platform to maintain that status.[61]

66.     Similarly, FanDuel operates the "FanDuel Players Club," where members earn FanDuel Points ("FDP") based on their betting activity (five FDP for every $1 in bets), which can be used to enter paid contests. The Players Club offers multiple status tiers with increasing rewards, including monthly and weekly free plays.[62] The program's highest tiers—MVP, Hall of Famer, Legend, and GOAT (Greatest of All Time)—all require significant monthly play and provide members with a personal account manager, premium customer support, and access to special promotions.[63] The program automatically enrolls all players, with status determined by monthly FDP earnings that reset each month, which promotes continual, high-volume betting to maintain status.[64]

67.     DraftKings' and FanDuel's sophisticated loyalty and retention programs enable and reinforce addictive gambling patterns. Industry experts advocate offering loyalty programs and promotions to help strengthen players'

---

[61] *Id.*

[62] FANDUEL, *FanDuel Players Club*, available at: https://www.fanduel.com/fanduel-points (last accessed March 11, 2025).

[63] *Id.*

[64] *Id.*

desire to play, leading to "high LTV."[65] While presented as customer service, these retention tactics can make it harder for at-risk players to break problematic gambling cycles by offering escalating rewards and status tied to betting volume.[66]

68.    As one article in the *Frontiers of Psychiatry* put it, "[s]ystems of rewards and punishments in online gambling products are designed to encourage continued use and attention, additional payments, or other behaviors that are not always beneficial to the user[.]"[67] The VIP programs are the most extreme expression of this type of design.

69.    VIP hosts and managers have direct access to "VIPs" and are able to directly message users and access real-time data on their activity on the platform.

70.    That access and robust user data, coupled with the hosts' and managers' directive to keep these players betting as much as possible, creates an extremely potent mechanism to break down the defenses of individuals struggling with a gambling disorder. If there is a gap in an addicted VIP user's betting activity, that

---

[65] INTARGET, *Exploring Customer Lifetime Value in the iGaming Industry*, available at: https://intarget.space/blog/exploring-customer-lifetime-value-in-the-igaming-industry    (last accessed on March 11, 2025).

[66] *Id.*

[67] Gainsbury SM, Black N, Blaszczynski A, Callaghan S, Clancey G, Starcevic V and Tymula A (2020), *Reducing Internet Gambling Harms Using Behavioral Science: A Stakeholder Framework.* Front. Psychiatry 11:598589 (noting that mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but may also exploit individuals with addictive tendencies by encouraging continued or escalated gambling. The authors advise that these targeted mechanisms must be carefully managed and regulated, as they pose a substantial risk when not balanced with protective measures.)

may mean that they are trying to wean themselves off gambling or may be facing a personal hardship that requires their money and attention. But a VIP host views that gap as an opportunity to exploit the user at their most vulnerable and get them back on the platform.

71.    A recent article in the *Athletic* chronicled a FanDuel user struggling with a serious gambling disorder, being facilitated and exacerbated by his VIP representative:

> He hated himself. Several times, he tried quitting and would go days without placing a bet. Then his phone would ping. It was his VIP representative from FanDuel with a text message.
>
> *Hey Jordan. . . I just gave you a $200 bonus bet into your account.*
>
> [. . .]
>
> "I can't hold back my anger for them," Holt said. "I think the way FanDuel exploits people like me — if somebody doesn't gamble for a couple of days, they all of the sudden get a deposit bonus, or, 'Hey, you are part of the VIP Club!' The way it's being handled, it should be controlled more. It's the Wild, Wild West."[68]

72.    DraftKings is no better. A recent *Wall Street Journal* article described how DraftKings "rewarded" a woman, who was demonstrating that she was in the throes of an addiction, with inducements to bet more. The woman, a psychiatrist named Kavita Fisher, engaged in a lengthy interview with reporter Kate Linebaugh

---

[68] Jason Quick, *'I literally can't stop.' The descent of a modern sports fan*, THE ATHLETIC (Oct. 14, 2024), https://www.nytimes.com/athletic/5777632/2024/10/14/sports-betting-addiction-problem-fans/ (last accessed March 11, 2025).

about her experience using DraftKings' virtual casino platform:

> **Kate Linebaugh**: Kavita wanted to quit gambling in 2023, but after DraftKings made her a VIP, she says she was pulled in by the promise of bonuses. She figured that she could use the bonuses to win back her losses. After that initial email in December, Kavita and her host kept in close touch. Over the next four months, they exchanged dozens of emails, sometimes daily.

> **Kavita Fisher**: And he would offer bonuses or I would ask for a bonus if I didn't do well, and usually he would give me whatever bonus I wanted.

> **Kate Linebaugh**: And he was online most of the time?

> **Kavita Fisher**: Yeah, he seemed to know when I was playing as well. He could tell when I was playing and how much I played.

> **Kate Linebaugh**: In January, Kavita emailed her DraftKings host to say she was doing terribly and that she wanted to try a different game or quit gambling completely. But Kavita also asked her host for another bonus. She wrote, "Is there any way you could send me some VIP love?" In response, her host added $500 to her account and wished her luck, writing, "Hope you can get hot." Did you feel like the app was trying to incentivize you to keep playing? Did you sort of see the deal?

> **Kavita Fisher**: I could tell that there were times when I wanted to quit, but I knew that I had a bonus or some cash back from a tournament coming up in a few days. So I had to wait until then to quit. And then I would get lured into a different bonus and it would kind of just keep extending my quit date.

> **Kate Linebaugh**: Interesting. So the bonus is, they tell you you had a bonus, but it wouldn't hit immediately. So it keeps you in the universe until you get it?

> **Kavita Fisher**: Correct. It almost felt like it wasn't real. No way would I ever imagine myself even during that time walking into a casino and taking out 10 grand from my account and throwing it on a table. There's no way. But it just didn't feel real on the app. All you do is click a few

things to get money transferred over. There's no rationality that remains when you're doing it online compared to if you're in a live casino handling real cash.[69]

73.    DraftKings and FanDuel's VIP programs are designed to exploit the trust built between the VIP hosts or managers and users to get those users to engage and bet more, even when it is readily apparent that those users can't afford it.

74.    For example, upon information and belief, despite knowing that many VIP program members are struggling, DraftKings and FanDuel do not regularly require users participating in their VIP programs, who are frequent, high-volume gamblers, to submit to income verification checks, even though doing so would help DraftKings and FanDuel identify whether someone was actually gambling within their means.

75.    Given the amount of data they have on their consumers, Defendants' failure to do income verification checks allows them to profess ignorance or, at best, remain willfully ignorant, that many so-called "high rollers" in their VIP programs are demonstrating the hallmark signs of a gambling disorder. This, in turn, allows them to cloak themselves in plausible deniability and claim that they do not know whether members of their VIP programs have such disorders, all while collecting troves of behavioral data that allow them to target the most vulnerable.

---

[69] Kate Linebaugh, *How a Psychiatrist Lost $400,000 on Gambling Apps*, WALL STREET JOURNAL, (Mar. 15, 2024) https://www.wsj.com/podcasts/the-journal/how-a-psychiatrist-lost-400000-on-gambling-apps/c91168e8-8add-48bc-8f5f-324fe4680df6 (last accessed March 11, 2025).

76.    As recently as April 2024, advertisements for VIP account managers on FanDuel's website said candidates would be expected to "increase player activity and drive revenue."[70] Similarly, a listing on DraftKings' career portal for a VIP Host position states that the VIP Host will "[c]reate new business revenue by understanding and developing strong, authentic, and trusted player relationships"[71]

77.    Upon information and belief, DraftKings and FanDuel VIP hosts and managers continue to target Baltimore users whom they respectively know or should know have a gambling disorder.

### (b)    Promotions and Notifications

78.    VIP programs are not Defendants' only means of identifying and exploiting those with gambling disorders. Defendants also use "pings," notifications, and/or tailor-made promotions to extract maximum LTV, including by targeting those users Defendants know or have reason to know suffer from a gambling disorder.

79.    For example, Defendants weaponize promotions to induce problem gamblers to bet. DraftKings and FanDuel applications may offer users "free" bets (often a sum of cash with stipulations on how much of it can be used in a single

---

[70] Tom Bergin, *Online-gambling giants conquer U.S. with tactics deemed too tough for Britain,* REUTERS (July 3, 2024).

[71]    DRAFTKINGS,    *VIP    Host,    Washington    D.C.*,    accessible    at: https://careers.draftkings.com/jobs/jr10760/vip-host-washington-dc/ (last accessed March 11, 2025).

bet—for example, $200 that can be wagered in $10 increments) and bonuses, much like the promotions offered to first-time users, at any time. These promotions are offered to the user while they are actively scrolling in the app or website, or they may be sent to the user via "pings" to their device that appear as notifications. While some promotions run on the DraftKings and FanDuel platforms are accessible to all users simultaneously, many of these promotions are tailored to specific users.

80. When a user is not actively using the DraftKings or FanDuel applications on their phone, they still receive notifications from DraftKings or FanDuel that are not connected with any particular promotion being offered to the user; they are simply meant as reminders to the user that they should return to the application to bet more. These types of notifications are shown below in **Figure 2:**



Figure 2 – Notifications from DraftKings
("This past week your biggest payout was $50.00
Who are you backing this week? Bet Now!")

81.    These notifications and promotions are not random, but, rather, are systematically designed and deployed using Defendants' extensive data analytics capabilities to target users at moments when they are most likely to resume gambling. **Figure 2** is emblematic: there, DraftKings pulled a bettor's gambling history, and tried to induce them to continue to gamble, piggy-backing the promotion off of the user's "biggest" $50 payout and tossing in an emoji depicting someone with intense determination/frustration for good measure.

33

82.   The sophistication and effectiveness of this predatory system is so well-documented within the industry that even professional gamblers have learned to exploit it by mimicking addiction patterns—revealing just how intentionally the system is designed to prey upon those with gambling disorders.

### (c)   Exploitation Exposed: Professional Gamblers' Strategic Emulation of Addiction Patterns for Personal Gain

83.   So-called "sharps"—professional gamblers for whom sports betting is a job—have learned to mimic the behavior of problem gamblers by strategically using promotions and notifications on mobile betting apps like DraftKings and FanDuel to receive "rewards" from the company.

84.   Isaac Rose Berman, a prominent writer whose articles on sports betting have been published in the *Wall Street Journal*, has described how professional bettors have learned to take advantage of the mobile sports betting companies' desire to exploit problem gamblers:

> As Rufus Peabody, co-host of the Bet the Process podcast said on a recent episode, "In this current environment, in U.S. books, the best strategy for account longevity is to try to look like you're a degenerate gambler, look like you're a problem gambler. . . what becomes kind of dirty is trying to do those things and act like a problem gambler knowing that they're going to cater to you."

> Such behavior takes various forms. One pro bettor I know set up a bot which logs in to his accounts every day between 2 and 4 am, to make it seem like he can't get through the night without checking his bets. Another withdraws money and then reverses those withdrawals so it looks like he can't resist gambling.

> Some efforts go even further, and attempt to game the responsible gaming tools. I recently met a pro bettor who swore that at a certain sportsbook, if you opted into and then out of deposit limits—which prevent you from depositing more than a certain amount over the course of a week or month—your betting limits would stay high for longer, because "they know sharp bettors don't put themselves on those lists."

> Anecdotally, I've noticed that when users opt into cool-off periods—which prevents them from logging into an account for as little as a day—they're often greeted with a deposit match when they come back . . ."[72]

85.    Reporting indicates that the "sharps" were on to something and that the major online betting companies were taking advantage of their most vulnerable users. For example, Ravi Naik, a visiting fellow at Oxford University's Internet Institute and a data rights lawyer, chronicled how Sky Bet, a company, like FanDuel, also owned by Flutter, tried to "win back" a consumer working to kick a gambling disorder:

> Naik documented the effects of Sky Bet's data-profiling software on one user who was trying to kick a severe gambling disorder. The platform knew his location coordinates, banking records, mortgage details, and all his wager habits. Once he began weaning off the platform, Sky Bet labeled him a customer to win back, inundating him with targeted ads and marketing fine-tuned to the vulnerabilities the software had detected in his patterns of behavior. They even evaluated his exact worth to the company if he returned to the platform. [73]

---

[72] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts*, HOW GAMBLING WORKS (Sept. 10, 2024), https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (last accessed March 11, 2025).

[73] Luke Goldstein, *Rollups: The Big Data Machine Driving Online Sports Betting*, THE AMERICAN PROSPECT (Apr. 4, 2022), https://prospect.org/power/rollups-big-data-machine-driving-online-sports-betting/ (last accessed March 11, 2025).

86.     The reporting further indicated that SkyBet had been tracking upwards of 186 different player attributes, the better to attract, and ultimately exploit, the consumer. This extension of the Big Data business model DraftKings and FanDuel employ enables them to closely monitor customer behavior and use that behavior to their advantage, not only to hook customers, but to take what they can from those they identify as having a problem with gambling.

### 4.     Defendants' Actions Have Devastating Consequences

87.     Having a gambling disorder poses a substantial risk to the individual and those around them. According to one meta-analysis, more than 30% of problem gamblers report suicidal ideation, a far greater rate than the general public or those suffering from other addiction disorders.[74]

88.     Children of problem gamblers are also up to three times more likely to be abused by a parent than their peers, and intimate partners of problem gamblers are more than ten times more likely to visit an emergency room as a result of being physically assaulted than the intimate partners of problem drinkers.[75] Problem gamblers are also often the victims of domestic violence, particularly at the hands of

---

[74] Kristensen, J. H., Pallesen, S., Bauer, J., Leino, T., Griffiths, M. D., & Erevik, E. K. (2024). Suicidality among individuals with gambling problems: A meta-analytic literature review. *Psychological Bulletin, 150*(1), 82–106, available at: https://doi.org/10.1037/bul0000411 (last accessed March 11, 2025).

[75] MARYLAND CENTER OF EXCELLENCE ON PROBLEM GAMBLING, *Problem Gambling & Domestic Violence*, accessible at: https://www.mdproblemgambling.com/problem-gambling-and-domestic-violence-2024/ (last accessed March 11, 2025).

parents.[76]

89.    The harmful impacts of DraftKings' and FanDuel's exploitative practices are acutely felt in Maryland, and the City of Baltimore specifically.

90.    The Maryland Center of Excellence on Problem Gambling reports that while 11.3% of Marylanders who participated in "traditional" sports betting showed signs of disordered gambling, 20.8% of online sports bettors showed signs of disordered gambling.[77]

91.    Mary Drexler, the program director at the University of Maryland's Center of Excellence on Problem Gambling, has warned that staff members of the gambling hotline have been "noticing a disturbing trend. . . . We are starting to see more calls from college-age males and their parents. . . . As the industry booms, problem gambling is growing too, especially among 18- to 24-year-old men who grew up loving sports—and their phones—and can't restrain their mobile sports betting impulses."[78]

---

[76] Nicki Dowling, Erin Oldenhof, Sue Cockman, Aino Suomi, Sephanie Merkouris, Alun Jackson, *Problem Gambling and Family Violence: Factors Associated with Family Violence Victimization and Perpetration in Treatment-Seeking Gamblers*, 36 J. of Interpersonal Violence 15–16 (Mar. 2019), accessible at: https://journals.sagepub.com/doi/10.1177/0886260519835877.

[77] MARYLAND CENTER OF EXCELLENCE ON PROBLEM GAMBLING, *Understand the Risks*, available at: https://www.mdproblemgambling.com/sports-betting-2/understand-the-risks/ (last accessed in March 11, 2025).

[78] Jeff Barker, *As problem gambling rises, revenue-focused regulators resist Maryland reforms: 'Warning signs are flashing,'* THE BALTIMORE SUN (Feb. 14, 2025), available at: https://www.baltimoresun.com/2025/02/14/problem-gambling-maryland-regulators-sportsbooks/?share=r2aanawnsm0ttu2sb4yr (last accessed March 11, 2025).

92.    Jeff Barker of the *Baltimore Sun* relayed these concerns in a February

14, 2025 article:

> "It's just easier to pile up debt or money you don't actually have," Del.
> Julie Palakovich Carr, a Montgomery County Democrat, said in an
> interview. "Most people recognize that this is supposed to be
> entertainment, but for folks who are addicted, we should be putting
> those safeguards in place."
>
> On Feb. 6, Palakovich Carr testified before the Ways and Means
> Committee on her bill prohibiting credit card use for sports wagers and
> raising the minimum age for fantasy games.
>
> Sitting at a long witness table, the delegate argued that 10 other states
> prohibit using credit cards for sports bets and said 'warning signs are
> flashing' about players, particularly college-age men, awash in
> gambling debt. Many sports betting sites heavily market in the state and
> provide millions of dollars in free promotional play designed to entice
> bettors. 'This is a generation of individuals who are very savvy on
> mobile and online (devices) and have the opportunity to do so many
> more types of betting,' [Mary] Drexler said. 'With sports betting it's
> not just who wins and loses, it can be on every play of the game.'
> Drexler was referring to 'live betting,' in which gamblers wager on
> multiple in-game scenarios, such as whether a batter will get a hit or a
> quarterback will throw an interception. Sports bettors almost always
> lose money in the long run. In many ways, their wagering is akin to a
> 2-point conversion attempt in the NFL. The ball seems tantalizingly
> close to the goal line, but teams convert fewer times than not.[79]

93.    Will Hinman, a peer recovery specialist at the Center of Excellence on

Problem Gambling, has also observed a significant spike in calls from young men

experiencing signs of a gambling problem since mobile sports betting (dominated

---

[79] *Id.*

by Defendants) was rolled out in the state.[80]

94.    While sports gambling and online sports betting are relatively new to Maryland and the City of Baltimore, even in the short time it has been permitted it has become evident that the pernicious behavior of DraftKings and FanDuel, as the head-and-shoulders leaders in this space, has started to cause harm to the City. Vulnerable Baltimore citizens are being deliberately targeted and hounded by these sports betting platforms with no real regard for their safety or well-being, and the collateral impacts of this exploitation are being felt by these citizens, their families, and the institutional services that are trying to help them.

95.    Of course, Defendants' actions also clearly contravene Maryland's public policy that seeks to avoid the exploitation of those with gambling disorders. Maryland Sports Wagering Regulations, issued by the Maryland State Lottery and Gambling Control Agency, mandate that, "[a] sports wagering licensee, directly or through a contractor or vendor on behalf of the licensee, may not: . . . *conduct sports wagering in a manner that may adversely impact the public* or the integrity of sports wagering." Md. Code Regs. 36.10.13.41(C)(2)(d) (emphasis added).

---

[80] Jack Hogan, *MD eyes new gambling frontier, but critics say state must reckon with sports betting harm*, THE MARYLAND DAILY RECORD (Dec. 30, 2024), https://thedailyrecord.com/2024/12/30/md-eyes-new-gambling-frontier-but-critics-say-state-must-reckon-with-sports-betting-harm (last accessed March 11, 2025).

C.    **Defendants Choose Not To Employ Protections That They Employ Abroad**

96.    Of course, if DraftKings and FanDuel can choose to induce gamblers they know to have a problem to engage on their platforms, *they can also choose not to do so.*

97.    In the United Kingdom, for example, companies have interpreted regulations as requiring them to "use data on client behavior to identify potentially compulsive or problem gambling" and *prevent* those people from using the platforms to excess.[81] As Reuters explained regarding BetMGM and FanDuel's parent companies' practices:

> In Britain, where online gambling is more established than the United States, Flutter and other bookmakers have in recent years acknowledged some of their previous practices risked causing harm and ended those practices. Some have also publicly accepted a responsibility to protect customers from problem gambling as cases of addiction, suicide and gambling-related crime stacked up there. But in the booming American market, Dublin-based Flutter and Britain's Entain (ENT.L) — which jointly own[ ] U.S. sports betting company BetMGM — have not implemented many of those same safeguards. They also routinely employ practices they discontinued in Britain after admitting they put UK gamblers at risk, Reuters found, based on a review of corporate filings, company statements, executive testimony to lawmakers, job advertisements and interviews with gamblers and former employees. In Britain, the two gambling giants volunteered to curtail VIP programs that induce customers to spend more after acknowledging the potential for harm to gamblers. And Flutter

---

[81] Tom Bergin, *Online-gambling giants conquer U.S. with tactics deemed too tough for Britain,* REUTERS (July 3, 2024), available at: https://www.reuters.com/investigations/online-gambling-giants-conquer-us-with-tactics-deemed-too-tough-britain-2024-07-03/ (last accessed March 11, 2025).

introduced protections for bettors under 25 years old, having said "younger people can be more vulnerable to experiencing gambling harm.[82]

98.    In April 2023, the British government issued a comprehensive white paper titled "High stakes: gambling reform for the digital age" that laid the groundwork for substantial regulatory changes.[83]

99.    Building    on    this    foundation,    in    May    2024,    the United Kingdom's Gambling Commission implemented concrete reforms that included enhanced financial vulnerability checks, which involve identifying and supporting individuals who may be vulnerable due to a gambling.[84] The threshold to trigger a vulnerability check, starting in August 2024, was £500—meaning that a check would occur if an individual deposited more than £500 towards gambling, with the threshold decreasing to £150 by February 2025.[85]

100.    The Commission also imposed restrictions on gaming platform designs that encourage excessive play, mandated improved consumer choice over marketing communications, and strengthened age verification requirements by raising the age-

---

[82] *Id.*

[83] GOVERNMENT OF THE UNITED KINGDOM, *High Stakes: gambling reform for the digital age*, available at: https://www.gov.uk/government/publications/high-stakes-gambling-reform-for-the-digital-age/high-stakes-gambling-reform-for-the-digital-age (last accessed March 11, 2025).

[84] *Id.*

[85] GAMBLING COMMISSION OF THE UNITED KINGDOM, *New rules boosting safety and consumer choice*, available at: https://www.gamblingcommission.gov.uk/news/article/new-rules-boosting-safety-and-consumer-choice (last accessed March 11, 2025).

check threshold from 21 to 25 years.[86]

101.  Flutter and other operators in Britain have also voluntarily curtailed their VIP programs after acknowledging these programs' potential to harm gamblers, and have also introduced specific protections for bettors under 25 years old, recognizing that younger people can be more vulnerable to experiencing gambling harm.[87]

102.  The protections the platforms volunteered abroad—like financial vulnerability checks, curtailing VIP programs, and protecting those under 25 years old—on information and belief have not been implemented by DraftKings or FanDuel anywhere in the United States (including the City of Baltimore).

103.  These changes and others could aid problem gamblers and forestall Baltimoreans from developing and becoming victim to gambling disorders. DraftKings and FanDuel could leverage their troves of user data for good if they wanted to. As some researchers have suggested, the same behavioral data that can be used to identify problem gamblers and build tools to most efficiently exploit those gamblers can also be used to create socially responsible tools that can help combat

---

[86] *Id.*

[87] *Id.*

the addictive behavior of these same individuals.[88]

104.   For example, the behavioral data could be used to target an individual engaging in behavior suggestive of a gambling problem and provide them with a message, in real time, highlighting the concerning behavior (such as depositing more money into an account after loses exceeding their normal gambling pattern), which could induce the problem gambler to step away from that particular transaction or be more mindful about their transactions.[89]

105.   Despite having extensive data analytics capable of identifying problematic gambling patterns, and despite being well-positioned to implement crucial safeguards *that they employ in other jurisdictions*, such as financial vulnerability checks, restrictions on VIP programs, and enhanced protections for young gamblers, DraftKings and FanDuel have chosen not to do so.

106.   Instead, Defendants try, with every promotion, every notification, every VIP solicitation, to take what they can from the most vulnerable Baltimoreans, and maximize consumers' "lifetime value," no matter the consequences.

---

[88] *See generally*, G. Drosatos, F. Nalbadis, E. Baines, *et al.*, *Enabling Responsible Online Gambling by Real-time Persuasive Technologies*, 17 Complex Systems Informatics and Modeling Quarterly 44 (2018).

[89] *Id*. at 46.

## VI.    CLAIM FOR RELIEF

### Unfair, Abusive, And Deceptive Trade Practices
### Baltimore City Code Art. 2, §2

107.    The City of Baltimore reasserts, realleges, and incorporates by reference each of Paragraphs 1–106, above, as though fully set forth below.

108.    The CPO, Baltimore City Code Art. 2, §4, protects consumers and others against "unfair, abusive, or deceptive trade practices," which are defined in line with the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law, § 13-301. *See* Baltimore City Code Art. 2, § 4-1 (13).[90] These "[u]nfair, abusive, or deceptive trade practices include[,]" include any:

> a.  False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers, Md. Code Ann., Com. Law, § 13-301(1);
>
> b.  Failure to state a material fact if the failure deceives or tends to deceive Md. Code Ann., Com. Law, § 13-301(3);
>
> c.  Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material

---

[90] *See, also*, Baltimore City Council, *Law 23-0424 (Comments from Baltimore Law Department and Chief Solicitor)*, available at: https://baltimore.legistar.com/LegislationDetail.aspx?ID=6322280&GUID=04376B1E-3696-45E8-8DC8-8457391147DE&Options=&Search=&FullText=1 (last accessed March 11, 2025).

fact with the intent that a consumer rely on the same in connection with:

(i)   The promotion or sale of any consumer goods, consumer realty, or consumer service, Md. Code Ann., Com. Law, § 13-301(9)(*i*);

109.   Any "practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." *Id.* § 13-302. While specific practices are enumerated in the MCPA (and, by extension, the CPO), "[i]t is the intent of the [Maryland] General Assembly that in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretations of § 5 (a)(1) of the Federal Trade Commission Act [(15 U.S.C. § 45)] by the Federal Trade Commission and the federal courts." Md. Code Ann., Com. Law § 13-105. The Federal Trade Commission has explained that unfairness under 15 U.S.C. § 45 is determined in part by a consideration of "(1) whether the practice injures consumers," and "(2) whether it violates established public policy."[91]

110.   Defendants are "merchants" within the meaning of, and subject to, the provisions of the CPO. Baltimore City Code Art. 2, § 4-1 (9).

---

[91] FTC Policy Statement on Unfairness, Dec. 17, 1980, available at: https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness (last accessed March 11, 2025).

111. Defendants' actions are deceptive and unfair. Without limitation, Defendants violate the CPO by:

    a. Using sophisticated algorithms and data analytics to refine their targeting of vulnerable Baltimore users with personalized inducements designed to exploit the users' gambling disorder;

    b. Using exploitative means to trick Baltimore consumers into betting on their platforms, including through the misleading use of betting inducements like so-called "bonus bets" or "no-sweat bets" specifically targeted to create compulsive gambling behavior;

    c. Misrepresenting the nature, terms, and conditions of these promotional offers by failing to adequately disclose material terms and conditions, including wagering requirements before funds can be withdrawn;

    d. Using data collected to identify Baltimoreans with a gambling disorder and then specifically directing promotions and/or notifications at those users in order to induce them to bet further;

    e. Deploying push notifications, emails, and in-app messages with misleading urgency (e.g., "limited time offers" and "act now" messaging, *supra*, **Figure 2**) purposefully directed to those Baltimoreans Defendants know, suspect, or have reason to know or

suspect to have a gambling disorder, to create false time pressure
and exploit gamblers' fear of missing out;

f.  Using VIP programs to identify and exploit those with gambling
disorders, including by using the VIP programs to create tailored
inducements to induce betting by Baltimoreans whom Defendants
know or should know to be demonstrating disordered gambling
behavior;

g.  Offering escalating rewards through these VIP programs directly
proportional to gambling losses, thereby incentivizing harmful
behavior, and targeting those programs to Baltimoreans with
gambling disorders; and,

h.  Failing to implement effective responsible gambling measures to
identify those Baltimoreans whom Defendants should not be
targeting for promotions, despite having sophisticated technology
capable of identifying problematic gambling behavior.

112.  Defendants' unfair and deceptive practices cause substantial injury to
Baltimore consumers that is not reasonably avoidable by consumers themselves.

113.  Defendants' actions are against public policy. It is public policy, as set
forth in the Maryland Sports Wagering Regulations, that sports wagering licensees
may not target those with gambling disorders and thus "conduct sports wagering in

a manner that may adversely impact the public or the integrity of sports wagering." Md. Code Regs. 36.10.13.41(C)(2)(d) (emphasis added).

114.    Each ping, enrollment, and retention in a VIP program, "bonus bet," or other promotion, and/or push notification directed to a person whom Defendants know, have reason to know, or suspect to be suffering from a gambling disorder is a separate violation of the CPO.

115.    Each misleading inducement that Defendants used to generate new users is likewise a separate CPO violation.

116.    Defendants' actions demonstrate a callous disregard not only for the rule of law, but also for the public health, safety, and well-being of Baltimore consumers. While engaging in the unlawful practices alleged herein, Defendants have, at all times, acted willfully. Defendants knew or should have known that their actions were of the nature prohibited by the CPO.

117.    As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

## VII.  REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, the City of Baltimore, respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

a.    Awarding the maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4;

b.    Injunctive relief mandating that Defendants cease the targeting and exploitation of disordered gamblers;

c.    Injunctive relief requiring Defendants to reform their platforms' exploitative platform design feature restrictions and enhanced marketing restrictions, Baltimore City Code Art. 2, § 4-5(d); and,

d.    Awarding such other relief as may be available and appropriate under the law or in equity.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims upon which a jury trial is available.

Dated: April 3, 2025

Respectfully submitted,

*/s/* Ebony M. Thompson
Ebony M. Thompson
City Solicitor
Sara Gross
Chief, Affirmative Litigation Division
Thomas P.G. Webb
Deputy Chief, Affirmative Litigation
Division
**BALTIMORE CITY LAW
DEPARTMENT**
City Hall, Room 101
100 North Holliday Street
Baltimore, Maryland  21202
Tel: (443) 984-3421
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov

Adam J. Levitt*
Daniel R. Schwartz*
Daniel R. Ferri*
Eaghan Davis*
Rebecca Trickey*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dschwartz@dicellolevitt.com
dferri@dicellolevitt.com
edavis@dicellolevitt.com
rtrickey@dicellolevitt.com

*\*pro hac vice* motions to be filed

*Counsel for Plaintiff, the City of Baltimore*