**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| CITY OF BALTIMORE, *ex rel.* Ebony Thompson,<br><br>*Plaintiff*,<br><br>         v.<br><br>DRAFTKINGS INC., a Nevada corporation, and FLUTTER ENTERTAINMENT PLC d/b/a FANDUEL INC., an Irish corporation,<br><br>*Defendants*. | Case No. 1:25-cv-01487-SAG<br><br>Hon. Stephanie A. Gallagher |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND**

This case belongs in state court. The City of Baltimore (the "City") sued to enforce its Consumer Protection Ordinance against sports betting operators who prey on citizens by: (1) purposefully designing their platforms to create disordered gamblers; and (2) actively seeking out users with gambling disorders (created by Defendants and otherwise) and deliberately exploiting those users through predatory VIP programs or other inducements designed to keep those disordered gamblers betting.

Under the *Burford* abstention doctrine, established by the United States Supreme Court, this Court should decline to exercise jurisdiction and remand the case to state court where it belongs – just as the Fourth Circuit did in *Johnson v. Collins Ent. Co.*, 199 F.3d 710 (4th Cir. 1999), another case in which the plaintiff alleged that the defendant's gambling game (there, video poker) violated a state's Unfair Trade Practices Act because its design and implementation created disordered gamblers.

The City's claims require interpretation of its Consumer Protection Ordinance and that law's interplay with the State of Maryland's gambling regulatory framework—precisely the type of state policy matter that federal courts should leave to state tribunals. As the Fourth Circuit

explained in *Johnson*, "[t]he regulation of gambling enterprises lies at the heart of the state's police power," and "[f]ormulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens." *Id.* at 720. As the *Johnson* court also explained, enforcement of a consumer protection ordinance will "have a potentially broad sweep, and the meaning accorded to [the terms unfair and deceptive] will chart the course of state public policy." A "district court errs…in manning the rudder in this aspect of state gaming policy when it decide[s] for itself that [the gaming implementation represented] unfair trade practices as a matter of law." *Id.* at 720-21.

Baltimore is Maryland's largest municipality, and enforcement of its consumer protection ordinance—the only claim here pled—will have a substantial impact on the State's gaming policy writ large. *Burford* abstention is accordingly appropriate: this is a local matter concerning application of a city ordinance applied to gambling, an area in the "heart of the state's police power." *Id*.

## FACTUAL BACKGROUND

### A.    The City's Enforcement Action

The City filed this lawsuit on April 3, 2025, in the Circuit Court for Baltimore City, alleging that DraftKings and Flutter Entertainment (operating as FanDuel)[1] systematically work to create, and then target, individuals with gambling disorders. ECF 1-4 at 1-8. The Complaint asserts a single cause of action: violation of Baltimore's Consumer Protection Ordinance ("CPO"), Baltimore City Code Art. 2 § 4, *et seq.*, which prohibits unfair and deceptive business practices in the City. *Id*. at 45. Defendants removed the case to this Court on May 7, 2025.

---

[1] The City intends to amend its complaint to reflect that BetFair Interactive US LLC is the licensed entity that operates FanDuel Sportsbook in Maryland.

As alleged, Defendants: (1) purposefully design their platforms so that their users become disordered gamblers; and (2) work to identify users exhibiting signs of problem gambling (such as chasing losses, betting erratically, or expressing desperation to Defendants' VIP representatives), and specifically target those users with further inducements to gamble. *Id*. at 10-44. The City seeks civil penalties and injunctive relief to stop these practices. *Id*. at 49-50. The City does not seek actual damages or any penalties other than those authorized by the ordinance. *See generally*, ECF 1-4.

### B.    Baltimore Passes the CPO

Baltimore enacted the CPO to provide residents robust remedies against unfair and deceptive business practices. Balt. City Code Art. 2, § 4, *et seq*. The CPO's enforcement mechanisms reflect Baltimore's commitment to consumer protection, empowering the City to investigate violations and the City Solicitor to bring civil actions on behalf of the Mayor and City Counsel. The City may seek civil penalties of up to $1,000 per violation and obtain temporary and permanent injunctive relief to prevent ongoing harm. Balt. City Code Art. 2, §§ 4-3, 4-5(d). The ordinance broadly prohibits "unfair, abusive, or deceptive trade practices" in the sale or offer for sale of consumer goods, consumer services, or consumer realty within city limits. Balt. City Code Art. 2, § 4-2. Each violation constitutes a separate offense, and continuing violations can result in daily penalties, providing a strong deterrent against predatory business practices. Balt. City Code Art. 2, § 4-3(b)-(c).

The CPO also explicitly incorporates Maryland's Consumer Protection Act, stating that the "meaning" of "unfair, abusive, or deceptive trade practices" under the CPO shall have the same meaning as the term does in Title 13 of Maryland's Commercial Law Article (Maryland's Consumer Protection Act).

**C.    The State of Maryland Legalizes and Regulates Sports Betting**

For decades, Maryland, like most states after the 1992 passage of the Professional and Amateur Sports Protection Act ("PAPSA"), 28 U.S.C. § 3701, prohibited sports betting.

That changed in 2018, when the United States Supreme Court struck down PAPSA in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), and in 2020, when Maryland voters approved a constitutional amendment authorizing sports betting, Md. Const. Art. XIX, § 1(e) (2020).[2] The General Assembly subsequently enacted comprehensive sports betting legislation, creating an intricate regulatory framework overseen by the Maryland Lottery and Gaming Control Commission. Md. Code Ann., State Gov't §§ 9-1E-01 *et seq.*[3]

This wasn't a casual policy choice. Maryland spent years studying other states' experiences, balancing competing interests, and crafting regulations that would generate revenue while also protecting consumers.[4] The resulting legislative framework addresses a range of issues, including licensing requirements, advertising standards, and resources for problem gambling. *See, e.g.*, Md. Code Ann., State Gov't §§ 9-1E-05 (licensing), 9-1E-08 (license denial, fines, suspension), 9-1E-17 (advertising restrictions). From there, the Maryland State Lottery and Gaming Control Agency promulgated extensive regulations touching on all aspects of mobile sports betting, including provider applications, qualifications, license denials, enforcement actions,

---

[2] Ballotpedia, *Maryland Question 2, Sports Betting Measure (2020)*, available at: https://ballotpedia.org/Maryland_Question_2,_Sports_Betting_Measure_(2020) (last accessed on June 3, 2025).

[3] Maryland General Assembly, *Article § 9-1E-01*, available at: https://mgaleg.maryland.gov/mgawebsite/Laws/StatuteText?article=gsg&section=9-1E-01&enactments=false (last accessed on June 3, 2025).

[4] *See* Legal Sports Report, *A Look Back at the Long and Winding Road to Maryland Online Sports Betting*, available at: https://www.legalsportsreport.com/90843/history-of-maryland-sports-betting-launch/ (last accessed on June 3, 2025).

inspections, voluntary exclusion programs, mandatory exclusion programs, problem gambler programs and related funding, responsible gaming plans, taxes, fees, penalties, and internal controls. *See* COMAR Chapter 36, Subtitle 10.[5]

## LEGAL STANDARD

A motion to remand must be filed within 30 days after the notice of removal is served. 28 U.S.C. § 1447. Plaintiffs timely bring this motion under the *Burford* abstention doctrine. *See Burford v. Sun Oil Co*., 319 U.S. 315 (1943).

The *Burford* doctrine rests on a simple premise: federal courts must not interfere with state efforts to address local problems through comprehensive regulatory schemes. As the Supreme Court explained in *New Orleans Public Service, Inc.("NOPSI") v. Council of New Orleans*, 491 U.S. 350, 361 (1989), a federal court "must decline" jurisdiction "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of public concern." At bottom, "[t]he underlying purpose of *Burford* abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs." *Meredith v. Talbot Cnty., Md.,* 828 F.2d 228, 231 (4th Cir. 1987) (citing 17 Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction § 4243) (abstaining from federal adjudication). In other words, abstention serves the "central idea . . . of simple comity." *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008). Federal courts must "respect the efforts of state governments to ensure uniform treatment of essentially local

---

[5] Maryland Lottery and Gaming Commission, *Sports Wagering Regulations*, available at: https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/ (last accessed on June 3, 2025).

problems." *Id.* "Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere[.]" *NOPSI*, 491 U.S. at 361.

This matter fits precisely into the *Burford* abstention framework: it concerns the application of the CPO – the unfair trade practices act for Maryland's largest city – to online sports gambling, a substantially regulated, major industry operating in an area of core state concern. The suit therefore implicates (1) areas of "state law bearing on policy problems of substantial public import" and (2) state efforts to establish a coherent policy with respect to a matter of public concern. *Id.*

## ARGUMENT

### A. Federal Adjudication Would Disrupt Maryland's Comprehensive Gambling Policy

Maryland didn't stumble into sports betting. The state spent years studying the issue,[6] ultimately requiring a constitutional amendment,[7] comprehensive legislation,[8] and detailed implementing regulations before allowing sports betting to commence in the state.[9] The resulting statutory and regulatory framework represents the state's comprehensive approach to this newly legalized industry, developed through democratic processes including statewide referenda,

---

[6] University of Maryland – Maryland Center of Excellence on Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2017*, available at: https://www.mdproblemgambling.com/wp-content/uploads/2023/01/2017-Gambling-Prevalence-Report-Final-.pdf (last accessed on May 27, 2025); University of Maryland – Maryland Center of Excellence on Problem Gaming, *Statewide Gambling Prevalence in Maryland: 2011*, available at: https://www.mdproblemgambling.com/wp-content/uploads/2023/02/2011-Prevalence-Study.pdf (last accessed on May 31, 2025).

[7] Md. Const. art. XIX, § 1(e) (2020).

[8] Md. Code Ann., State Gov't §§ 9-1E, *et seq.*

[9] Maryland Lottery and Gaming Commission, *Sports Wagering Regulations*, available at: https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/ (last accessed on May 31, 2025).

legislative deliberation, and rulemaking. Maryland's gambling regulations reflect the state's sovereign policy choices about how best to implement sports betting within its borders.

At the same time, the City alleges that Defendants are violating the law, irrespective of whether Defendants technically adhere to certain regulatory requirements.[10] Defendants, in turn, are likely to rest some of their defense on that technical adherence to certain requirements—for example, in response to this lawsuit, Defendant FanDuel has already stated in the press that it has "confidence [that] the company operates in accordance with laws…established and enforced by the state of Maryland Lottery and Gaming Control Commission."[11]

The court will, therefore, be tasked with analyzing the complex interplay between state regulatory permissions and local consumer protection standards—an intersection that Maryland courts, not federal tribunals, should interpret in the first instance. For example, Maryland's gambling regulations establish parameters for how operators may collect and utilize customer information within the state's regulatory framework. *See, e.g.*, COMAR 36.10.16.03 (geolocation requirements); COMAR 36.10.16.05 (age verification); COMAR 36.10.18.05 (bettor account information); COMAR 36.10.18.06 (information security); COMAR 36.10.10.02 (responsible gaming plan); COMAR 36.10.10.03 (responsible gaming requirements). The City alleges that Defendants' use of this data to identify and target vulnerable populations violates Baltimore's CPO, and that Defendants have been woefully deficient in engaging in "responsible gaming" as required under the regulations, which deficiency likewise represents an unfair trade practice. *See generally*

---

[10] To be clear, the City in no way concedes that Defendants *do*, in fact, adhere to regulatory requirements.

[11] WBALTV, Baltimore Sues Sportsbooks, available at: https://www.wbaltv.com/article/baltimore-sues-sportsbooks-target-vulnerable-residents/64390523 (last accessed on June 3, 2025).

ECF 1-4. Defendants are likely to argue that adherence to, e.g., data collection regulation—even if the data are used to target disordered gamblers—somehow insulates them from CPO liability.

The Fourth Circuit has explicitly recognized, in applying *Burford* abstention, that abstention is appropriate in cases like this one that implicate the state's regulation of gambling, since gambling regulation lies at "the heart of the state's police power." *Johnson*, 199 F.3d at 715; *see also Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003); *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999). In this respect, the Fourth Circuit is no outlier: the Supreme Court has treated gambling regulation as a quintessential state function for over a century. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986) ("*Posadas*"); *Marvin v. Trout*, 199 U.S. 212, 224 (1905). Other circuits share this consensus. *See Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) ("The regulation of gambling lies at 'the heart of the state's police power.'"); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare."); *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976); *Boynton v. Ellis*, 57 F.2d 665, 666 (10th Cir. 1932). And Congress has "sought to extend, not curb, state police power in this field." *Casino Ventures*, 183 F.3d at 311.

States exercise their broad discretion in addressing gambling's effects in various ways. States may conclude gambling brings an "increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime." *Posadas*, 478 U.S. at 341. States may also conclude that gambling fosters addiction and exploits human weakness, taking money from those who can least afford to gamble. *Id.* States may also choose regulatory approaches over prohibition, concluding that gambling enhances public welfare through

recreational choice and economic development. Gambling can generate tax revenue that funds schools, public works, and other government programs. *See Johnson*, 199 F.3d at 720. Whether—and how—to allow gambling is thus a local, state-level concern.

Federal courts accordingly routinely apply *Burford* abstention to cases implicating a state's gambling regime. *See e.g., Metro Riverboat Assocs., Inc. v. Bally's Louisiana, Inc.*, 142 F. Supp. 2d 765, 775-76 (E.D. La. 2001) (abstaining under *Burford* from deciding a RICO matter involving state gambling issues since there was: (1) a comprehensive regulatory scheme regarding gambling in the state; (2) "a large interest of the state in regulating" gambling; and (3) "a need for a unified approach" to issues relating to gambling regulation in the state); *Chun v. State of New York*, 807 F. Supp. 288, 291-92 (S.D.N.Y. 1992) (recognizing New York's "complex and comprehensive statutory scheme to regulate gambling" and, accordingly, abstaining from deciding whether a particular gambling activity was lawful under that scheme).

Indeed, the Fourth Circuit has already explained in *Johnson*—a case with striking similarities to this one—that *Burford* abstention is required where a plaintiff has alleged a defendant's gaming practices violate consumer protection laws. There, "Plaintiffs [were] habitual gamblers who have sued South Carolina poker operators as part of an effort to kick their habits." *Johnson*, 199 F.3d at 715. Plaintiffs sought to enjoin Defendants from making what Plaintiffs deemed to be excessive payouts to any given customer playing video poker – payouts, governed by separate state regulation, that Plaintiffs alleged fostered disordered gambling. *Id*. The *Johnson* district court would also ultimately issue an injunction that imposed requirements on defendants, such as a requirement that a "clarifying sign" be placed on video poker machines that better informed consumers of the video poker payouts. *Id*. at 718.

In issuing its decision, the Fourth Circuit recognized that video poker was a "multi-billion dollar business" for which's regulation "South Carolina has employed a variety of legislative, administrative, and judicial mechanisms."[12] *Id*. at 715. The court also repeatedly emphasized that gambling regulation rests at the core of a state's police power: *see*, *e.g.*, *id*. at 721:

> The regulation of gambling enterprises lies at the heart of the state's police power…. Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens…The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens…The question of how best to regulate gambling activity is also one to which different states can arrive at different answers based on their different experiences. State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other. Put another way, the question is whether the maximization of individual freedom and choice works a wholesale diminution in general social well-being. Each side of this scale embodies the classic subject matter of state prerogative…because this question involved a most basic problem of South Carolina public policy, the state court system should have been permitted the first opportunity to resolve it.

That need for deference was further reified by the *Johnson* plaintiffs' invocation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). The *Johnson* court made clear that "unfair competition law is a tool that states use in an attempt to regulate vast spheres of activity with which state police power has historically been concerned."  *Id*. at 720.  As the panel explained, "the SCUTPA, like many similar state statutes, prohibits commercial conduct defined as 'unfair' or 'deceptive'….these terms have a potentially broad sweep, and the meaning accorded to them will chart the course of state public policy." *Id*. at 720–21.[13]

---

[12] The Court explained that the "state judiciary has…been an active partner with the legislative and executive branches…through the adjudication of private actions and the review of administrative decisions." *Id*. at 716.

[13] In this way, of course, *Johnson* was distinguishable from a case in which the Fourth Circuit did *not* invoke Burford abstention, *Martin v. Stewart*, 499 F.3d 360, 368 (4th Cir. 2007). In *Martin*, the sole issue was whether a state gambling law was legal under the Fourteenth Amendment of the United States Constitution, a claim that was "plainly federal in origin and nature" and accordingly "independent of any state law violation." *Martin v. Stewart*, 499 F.3d 360, 368 (4th Cir. 2007).

*Johnson* is essentially "on all fours" with this matter. Like the South Carolina video poker in *Johnson*, the sports gambling here is a multi-billion-dollar industry regulated by all branches of state government and subject to a complex set of regulatory requirements implicated by the litigation. Like the plaintiffs in *Johnson*, the City here argues that Defendants' implementation of a gaming device is causing disordered gambling. And like the plaintiffs in *Johnson*, the City here invokes an unfair trade practices act, alleging that Defendants' predatory implementation of its gambling platform is "unfair" and "deceptive." Indeed, Baltimore's CPO explicitly invokes the Maryland Consumer Practices Act's definition of "unfair trade practices." The interpretation of the CPO's application of the terms "unfair" and "deceptive" to online gaming would therefore, as in *Johnson*, undoubtedly "chart the course of state public policy." *Johnson*, 199 F.3d at 721.

Indeed, this matter is an even *clearer* case than *Johnson* was. In addition to including a federal cause of action—RICO—that explicitly implicated federal law, *Johnson* was decided at a time when states primarily regulated traditional casino gambling under relatively static frameworks.

By contrast, Maryland's current sports betting regime represents a quantum leap in regulatory complexity. When the Supreme Court struck down PASPA in *Murphy*, 138 S. Ct. at 1461, it unleashed a regulatory revolution. Sports betting operates in a dynamic digital ecosystem spanning multiple mobile platforms, awash in real-time data analytics, that employ sophisticated customer targeting algorithms—precisely the conduct at issue here. The market now generates billions in annual revenue,[14] attracting major technology companies and requiring constant regulatory adaptation as operators deploy new technologies and business models. The pace of

---

[14] ESPN, *U.S. sports betting industry posts record $13.7B revenue for '24*, available at: https://www.espn.com/espn/betting/story/_/id/43922129/us-sports-betting-industry-posts-record-137b-revenue-24 (last accessed on May 31, 2025).

technological change in sports betting far exceeds traditional gambling regulation. Operators continuously update platforms and deploy increasingly sophisticated data analytics to maximize user engagement.[15] Unlike the relatively stable casino industry of previous decades,[16] sports betting regulation requires nimble, adaptive oversight. Indeed, Maryland's regulatory framework continues to evolve alongside these developments, requiring ongoing policy decisions about appropriate contours of acceptable gaming.[17]

This expansion makes Maryland's comprehensive approach all the more worthy of federal court deference.

### B.    Additional Policy Considerations Support Remand

Apart from established legal precedents and regulatory concerns, compelling policy reasons support remand. Baltimore's Affirmative Litigation Division, led by the City Solicitor, serves as the front line of consumer protection enforcement for Maryland's largest city. These local officials understand the vulnerabilities of Baltimore residents, the economic realities of urban communities, and the specific harms that predatory business practices inflict on city neighborhoods. They work daily with community organizations and local law enforcement to address the real-world impacts of problem gambling on Baltimore families. Their enforcement decisions reflect intimate knowledge of local conditions that federal courts cannot replicate.

This local expertise complements the specialized knowledge of state regulators. Maryland

---

[15] *See e.g.*, Delasport, *The History of Sports Betting: From Antiquity to 2025*, available at: https://www.delasport.com/history-of-sports-betting/ (last accessed on May 31, 2025).

[16] George G. Fenich, *Casino Gaming in the U.S.: Past, Present, and Future*, 13 Hospitality Review 1 (1995), available at: https://digitalcommons.fiu.edu/hospitalityreview/vol13/iss1/7 (last accessed on May 31, 2025).

[17] Maryland Lottery and Gaming Agency, *Sports Wagering*, available at: https://www.mdgaming.com/maryland-sports-wagering/ (showing catalog of approved events and wagers last updated on May 1, 2025) (last accessed on May 31, 2025).

chose to legalize sports betting through democratic processes, including a statewide referendum. In enacting sports betting laws and regulating the platforms, the Maryland Legislature and the Maryland Lottery and Gaming Control Agency balanced numerous competing interests. Gambling regulation remains dynamic. The Maryland General Assembly regularly considers new measures addressing emerging concerns.[18] The Maryland State Lottery and Gaming Agency continually updates its rules in response to developments in the gaming industry.[19] Federal court decisions interpreting local ordinances could impact certain aspects of this evolving framework, potentially hindering adaptive regulation and limiting future policy options.

Indeed, research has not revealed any Maryland case that has yet interpreted the online sports gaming regulations' potential interplay with Maryland's CPO. A Maryland state court, rather than this federal court, should be given the first opportunity to do so. *See Johnson*, 199 F.3d at 720 ("because this question involved a most basic problem of [State] public policy, the state court system should have been permitted the first opportunity to resolve it.").

### C.    Nothing Prohibits Abstention

#### 1.    Maryland courts provide an adequate forum

*Burford* abstention requires that state courts offer a timely and adequate review. *NOPSI*, 491 U.S. at 361. Maryland's judicial system easily satisfies this requirement. Maryland's appellate courts can provide authoritative interpretations of both state and local law. *See, e.g.*, *Bd. of Cnty. Commissioners of Washington Cnty. v. Perennial Solar, LLC,* 464 Md. 610, 612 (2019) (addressing

---

[18] *See* Maryland Legislature, *Mobile Gambling Study Testimony SB 706 (2025)*, available at: 27956_02252025_103745-339.pdf (last accessed on May 27, 2025).

[19] *See* Maryland Lottery and Gaming Agency, *Sports Wagering Regulations (Substantive Amendments and Public Comments, 2021, 2022, 2023)*, available at: https://www.mdgaming.com/maryland-sports-wagering/sports-wagering-regulations/ (last accessed on May 27, 2025).

interplay between state solar energy regulation and local zoning laws). Indeed, Maryland courts have extensive experience with consumer protection cases, *see, e.g.*, *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 150 (2007) (determining that plaintiffs stated cognizable claims under Maryland's Consumer Protection Act ("CPA")), and are increasingly familiar with gambling-related issues. *See CCI Entertainment, LLC v. State,* 215 Md. App. 359, 367 (2013) (addressing state's definition of "slot machine"); *F.A.C.E. Trading, Inc. v. Todd*, 393 Md. 364, 365 (2006) (addressing legality of machine gaming); *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 6, 878 A.2d 567, 570 (2005) (addressing online advertisements for virtual casino); *State v. One Hundred & Fifty-Eight Gaming Devices*, 304 Md. 404 (1985) (addressing state seizure of purportedly illegal gaming devices). Maryland courts are up to the task of deciding this matter.

### 2.  The Nature of Relief Sought Permits Federal Abstention

In addition to meeting *Burford*'s substantive requirements for abstention, the City's request for civil penalties and injunctive relief supports abstention under *Quackenbush v. Allstate Ins. Co.*, where the Supreme Court ruled "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary," but abstention is "unwarranted" in "a damages action." 517 U.S. 706, 731 (1996).

The relief here is "equitable or otherwise discretionary" and is not for "damages." *Id*. "[A] penalty is '[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine." *Gonzalez v. Sessions,* 894 F.3d 131, 137 (4th Cir. 2018) (quoting *Penalty*, *Black's Law Dictionary* (10th ed. 2014)). Civil penalties vindicate public policy, deter future violations, and fund enforcement efforts. *See, e.g., Alig v. Quicken Loans Inc.*, No. 5:12-CV-114, 2017 WL 5054287, at *28 (N.D.W. Va. July 11, 2017) (collecting cases and analyzing West Virginia's Consumer Protection Act, recognizing that "an award of civil penalties is not conditioned on an award of

actual damages."). They represent the government's sovereign interest in protecting its citizens, not a party's interest in recovering losses.

The penalties at issue here are also "discretionary." *Quackenbush*, 517 U.S. at 731. The CPO itself makes this clear, providing that violators are subject to "a civil penalty of not more than $1,000" per violation. Balt. City Code Art. 2, § 4-3(a), (b). The court determines how much of a penalty to impose, precisely the type of discretionary relief that permits abstention.

Finally, the City explicitly seeks comprehensive injunctive relief requiring Defendants to reform their platforms and cease targeting vulnerable gamblers. This equitable relief is inseparable from the penalty claims—both seek to vindicate the same public interests under the same legal theory. *See* ECF 1-4 at 49-50.

## CONCLUSION

The City of Baltimore and the State of Maryland have the sovereign authority to regulate gambling within their respective borders. Baltimore has the authority to protect its citizens through local ordinances, and state courts have the authority to harmonize these overlapping regulatory schemes. This Court should defer to these prerogatives by remanding this case to the Circuit Court for Baltimore City.

Date: June 6, 2025                    Respectfully submitted,

                                      */s/ Ebony M. Thompson*
                                      Ebony M. Thompson
                                      City Solicitor
                                      Sara Gross
                                      Chief, Affirmative Litigation Division
                                      Thomas P.G. Webb
                                      Deputy Chief, Affirmative Litigation Division
                                      **BALTIMORE CITY LAW DEPARTMENT**
                                      City Hall, Room 101
                                      100 North Holliday Street

Baltimore, Maryland  21202
Tel: (443) 984-3421
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov

Adam J. Levitt*
Daniel R. Ferri*
Daniel R. Schwartz*
Eaghan Davis*
Rebecca Trickey*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
dschwartz@dicellolevitt.com
edavis@dicellolevitt.com
rtrickey@dicellolevitt.com

*_pro hac vice_ motions forthcoming

**_Counsel for Plaintiff, the City of Baltimore_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2025, I filed this document, which caused the Court's electronic filing system to notify all counsel of record, listed below:

Richard R. Patch*
Clifford E. Yin*
Christopher J. Wiener*
Sarah E. Peterson*
**COBLENTZ PATCH DUFFY & BASS LLP**
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-cjw@cpdb.com
ef-sep@cpdb.com

Ty Kelly Cronin (Bar No. 27166)
Alison C. Schurick (Bar No. 19770)
Michael A. Brown (Bar No. 20814)
100 Light Street, 19th Floor
**BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC**
Baltimore, MD 21202
Telephone: (410) 862-1134
tykelly@bakerdonelson.com
aschurick@bakerdonelson.com
mbrown@bakerdonelson.com

*Attorneys for DraftKings Inc.*

Michael X. Imbroscio (Bar No. 20510)
Phyllis A. Jones*
Gary M. Rubman*
Andrew P. Stanner*
Amber M. Charles*
**COVINGTON AND BURLING, LLP**
One CityCenter
850 10th Street NW
Washington, D.C., 20001
(202) 662-6000
mimbroscio@cov.com

pajones@cov.com
grubman@cov.com
astanner@cov.com
acharles@cov.com

*pro hac vice* motions forthcoming

**Attorneys for Flutter Entertainment plc**


*/s/ Ebony M. Thompson*
Ebony M. Thompson
City Solicitor