**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| CITY OF BALTIMORE, *ex rel.* Ebony Thompson, | * | |
| | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-25-01487** |
| | * | |
| **DRAFTKINGS INC.,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**MEMORANDUM OPINION**</u>

The City of Baltimore ("the City") filed this action in Baltimore City Circuit Court against Defendants DraftKings, Inc. and Flutter Entertainment PLC d/b/a FanDuel Inc. (collectively "Defendants"), seeking to enforce the City's Consumer Protection Ordinance ("CPO"), Baltimore City Code Art. 2 § 4, *et. seq.* The City alleges that the Defendants design their online gambling platforms to encourage problem gambling and to induce users already exhibiting signs of problem gambling to increase their use. *See* ECF 1-4. The enforcement action seeks civil penalties and injunctive relief for Defendants' alleged violations. *Id.* Defendants removed the action to this Court, citing diversity jurisdiction. ECF 1.

 The City timely filed a motion to remand this case to state court, arguing the well-established abstention doctrine created in *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943). ECF 19-1. Defendants opposed remand, ECF 30, and the City filed a reply, ECF 44. Defendants filed a motion

to file a surreply, ECF 45, which was not opposed and will be granted.[1] No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated herein, this Court shall abstain from exercising jurisdiction over this case and shall remand the case to state court.

## I. BACKGROUND

In 2020, the State of Maryland legalized sports betting, in light of an overwhelmingly favorable referendum and bipartisan support in the Maryland legislature. The General Assembly passed a number of statutes creating a framework to govern the newly legalized sports gambling. Various state agencies, including the Maryland State Lottery and the Gaming Control Agency, contributed extensive regulations. *See* COMAR Chapter 36, Subtitle 10; ECF 19-1 at 4–5.

Shortly after sports gambling was legalized, the City enacted the CPO, "prohibit[ing] 'unfair, abusive, or deceptive trade practices' in the sale or offer for sale of consumer goods, consumer services, or consumer realty" within the City. ECF 19-1 at 3; ECF 30 at 5; Balt. City Code Art. 2 § 4-2. The CPO adopted many of the definitions and terms used in the Maryland Consumer Protection Act ("MCPA"), but the CPO applies only in Baltimore City. ECF 19-1 at 3; ECF 30 at 5. The CPO allows the City to seek civil penalties of up to $1000 per violation (including daily penalties for continuing violations) and to seek injunctive relief to prevent ongoing harm to its residents. *Id.*; Balt. City Code Art. 2, §§ 4-3, 4-5(d). No cases have yet interpreted the CPO's provisions. ECF 19-1 at 13; ECF 44 at 1, 4, 8–9.

On April 3, 2025, the City filed its enforcement action in the Circuit Court for Baltimore City seeking to enforce its CPO against the Defendants. ECF 1-4. Defendants removed the case to this Court, ECF 1, and the instant motion ensued. ECF 19.

---

[1] This Court is not necessarily persuaded that the City raised new issues in its reply, rather than new characterizations of already-raised issues. Nevertheless, in light of the lack of opposition, it has fully considered the proposed surreply brief, ECF 45-1.

## II.    ABSTENTION

Congress provided federal courts with so-called "diversity jurisdiction" over cases involving citizens of different states, where the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. And, "[f]ederal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). But there are certain "extraordinary and narrow exception[s]" to that general rule. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728 (1996) (internal quotation marks omitted). One is the *Burford* abstention doctrine, which counsels that federal courts must abstain in cases where their exercise of jurisdiction would demonstrate lack of comity or would interfere with state efforts to address significant policy issues. *See Meredith v. Talbot Cnty.*, 828 F.2d 228, 231 (4th Cir. 1987) ("The underlying purpose of *Burford* abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs."). In *New Orleans Public Service, Inc. v. Council of New Orleans* ("*NOPSI*"), applying that doctrine, the Supreme Court explained that "[w]here timely and adequate state-court review is available," a federal court "must decline" jurisdiction in two circumstances: "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of public concern." 491 U.S. 350, 361 (1989) (internal quotation marks omitted). The Fourth Circuit has stated that, in determining whether *Burford* abstention is justified, courts must "balance the state and federal interests to determine whether the importance of difficult state law questions or the state interest in uniform regulation *outweighs* the federal interest in adjudicating

the case at bar." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (emphasis in original). However, it has further noted, "both the Supreme Court and this court have specifically rejected the view that a strong state interest alone could justify *Burford* abstention." *Id.* at 369.

The City's Complaint is an enforcement action and does not seek damages. It seeks only the penalties provided in the CPO (exceeding $75,000 in total), along with injunctive relief. Penalties are equitable and "where the relief being sought is equitable in nature or otherwise discretionary, federal courts . . . can . . . decline to exercise jurisdiction altogether." *Quackenbush*, 517 U.S. at 721.

It is instructive to consider the competing Fourth Circuit precedents cited by both parties to evaluate the way in which *NOPSI*'s test has been applied in related factual circumstances. The City relies heavily on *Johnson v. Collins Entertainment Co., Inc.*, 199 F.3d 710 (1999). In *Johnson*, a group of habitual gamblers who wished to quit sued South Carolina video poker operators, seeking, in relevant part, an injunction to prevent those operators from paying out more than $125 daily to a single customer at a single location. The gamblers suggested that the larger cash payouts were furthering their gambling addictions. *Id.* at 717.

In its ruling, the *Johnson* court noted that video poker had become a multi-billion dollar industry in South Carolina since the state had authorized cash payouts eight years earlier. *Id.* at 715. South Carolina had enacted an extensive statutory regime to regulate the industry, had multiple agencies engaged in regular enforcement and regulatory efforts, and its Attorney General had issued opinions "on a wide range of video poker matters." *Id.* at 716. The South Carolina legislature also created an Administrative Law Judge (ALJ) division to hear some cases involving the video poker industry, and the general state courts were also "intimately involved in this scheme through the adjudication of private actions and the review of administrative decisions." *Id.* at 716.

4

The South Carolina statute imposed a limit to cash payouts of $125 per customer per day per location. S.C. Code. Ann. § 12-21-2791. The plaintiffs contended that the dollar amount should be an absolute cap, while the defendants argued, in part, that the limit "merely prohibits them from paying out more than $125 above the amount deposited by a player into the machines." *Johnson*, 199 F.3d at 717. Along with a number of other state law claims, the plaintiffs argued that the defendants' interpretations and higher payments constituted both a "special inducement" to play video poker, which is prohibited by statute, and an unfair trade practice under the South Carolina Unfair Trade Practices Act (SCUTPA). The plaintiffs also asserted a federal Racketeer Influenced Corrupt Organization ("RICO") claim premised on the multiple alleged state law violations. *Id.*

The *Johnson* defendants removed the case to federal court, citing the federal question presented by the plaintiffs' RICO claim. After considering the issues, the district court granted the requested injunction. *Id.* at 717–18. The Fourth Circuit, however, concluded that the district court should have abstained under *Burford* and that its injunction "improperly interfered with a state regulatory scheme whose design is at the heart of the state's police power." *Id.* at 715.

In its analysis, the Fourth Circuit rejected the plaintiffs' contention that "the district court's actions pose no risk of federal-state friction and do not interfere with state regulation of the video poker industry." *Id.* at 719. Instead, it found that "[t]he exercise of federal equitable discretion in this case supplanted the legislative, administrative, and judicial processes of South Carolina and sought to arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies." *Id.* at 719–20. The Fourth Circuit noted that gambling is "an area where state authority has long been preeminent," because "the regulation of lotteries, betting, poker, and other games of

chance" affect "the health, welfare, safety, and morals" of a state's citizens.[2] *Id.* at 720. The court noted the delicate balance between "the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other," concluding that "the search for proper balance in this police power function is a task presumptively committed to the democratically accountable institutions of a state." *Id.*

The court noted that in interpreting the meaning of the $125 payout limit in the South Carolina statute in the first instance, the district court "was necessarily trying to predict how the South Carolina Supreme Court would decide the question." *Id.* at 720. It found that "because this question involved a most basic problem of South Carolina public policy, the state court system should have been permitted the first opportunity to resolve it." *Id.* Pertinent to the instant case, the court also noted that "[s]tate unfair competition law is a tool that states use in an attempt to regulate vast spheres of activity with which the state police power has historically been concerned." *Id.* The court noted that defining the meaning of terms like "unfair" or "deceptive" "will chart the course of state public policy" and suggested that the district court improperly "mann[ed] the rudder of this aspect of state gaming policy" by deciding that certain violations were "unfair trade practices as a matter of law." *Id.* at 721. The Fourth Circuit noted that the existence of the federal RICO claims did not affect the abstention analysis because those claims were essentially "state law in federal law clothing." *Id.*

---

[2] Even Judge Luttig, who concurred but did not join the majority opinion in *Johnson* because he feared that some of the rhetoric would lead to an overly expansive use of *Burford* abstention in future cases, agreed that "the gambling business, if not the quintessentially local issue that the majority concludes it is, is imbued with sufficient local character that the state courts ought be accorded comity from the federal courts with respect to its regulation." *Id.* at 731 (Luttig, J., concurring).

Finally, the Fourth Circuit noted that the district court had "overreached when it effectively commandeered South Carolina's enforcement efforts" and risked disrupting "state efforts to establish a coherent policy with respect to video poker." *Id.* at 723. The district court's injunction had mandated, in relevant part, that the defendants post particular signage on each video poker machine and maintain certain logs subject to inspection. *Id.* at 724. The Fourth Circuit noted that those types of "enforcement mechanisms" are "the types of requirements ordinarily prescribed by state statutes or state enforcement agencies." *Id.*

While attempting to distinguish *Johnson,* for their part, Defendants rely heavily on the Fourth Circuit's decision in *Martin,* 499 F.3d 360. In that case, a manufacturer and an owner/operator of coin-operated video game machines sued South Carolina state officials, asserting that portions of the South Carolina Video Game Machines Act violated their federal due process and equal protection rights. *Id.* at 362–63. In particular, the challenged law outlawed certain gaming machines and permitted law enforcement officers to seize prohibited machines and bring them before a magistrate, who could determine the machine's legality and order its destruction. *Id.*

The district court abstained from resolving the case, citing *Burford* and *Johnson*. However, the Fourth Circuit reversed that decision. It first noted that the *Martin* case presented solely federal constitutional claims. *See id.* at 364-65 (citing *NOPSI,* 491 U.S. at 361-62 (noting that no "state-law claim" was involved in that case) and *McNeese v. Bd. of Educ.,* 373 U.S. 668, 674 (1963) ("declining to abstain when 'no underlying issue of state law control[s]' and '[t]he right alleged is . . . plainly federal in origin and nature'") (alteration in *Martin*)). The challenges in *Martin* included arguments that South Carolina's law was void for vagueness, allowed arbitrary

enforcement, provided no pre-enforcement mechanism, and was enforced discriminatorily. *Id.* at 365. All of those are federal constitutional questions.

The *Martin* court also noted that the state statute in question had been "well defined" by the state courts and presented no difficult issue of state law. *Id.* at 366. The case also presented a facial attack on South Carolina's statute as a whole, so it posed no threat to the state's interest in uniform regulation. *Id.* at 367. In fact, the Fourth Circuit had previously decided that "the threat that the federal courts might decide the entire state system unconstitutional is not a valid justification for *Burford* abstention." *Neufeld v. City of Baltimore,* 964 F.2d 347, 351 (4th Cir. 1992). The *Martin* court specifically distinguished between "federal claims that rest on an alleged predicate violation of state law and those that do not," finding that distinction to be a factor relevant to consideration of abstention. 499 F.3d at 368. The Fourth Circuit also specified that its *Johnson* decision did not indicate that abstention was warranted because the case involved the regulation of gambling. *Id.* at 369. Instead, it clarified that adjudication in *Johnson* would have required the federal court to "answer disputed questions of state gaming law that . . . powerfully impact the welfare of [state] citizens" and that the relief sought would "effectively establish[] parallel federal and state oversight of the [state] video poker industry." *Id.* at 369 (quoting *Johnson,* 199 F.3d at 720, 723-24) (alteration in *Martin*). In other words, *Martin* makes clear that while there is no automatic "gambling" abstention doctrine, the important state interest in regulating gambling is one factor relevant to the application of the *Burford* test.

Defendants argue vehemently, and correctly, that this case does not challenge any administrative enforcement action. *See* ECF 30 at 6; ECF 45-1 at 1–2. Of course, this case itself IS an enforcement action brought by the City to enforce its new statute. Moreover, the test in *NOPSI* does not restrict application of the *Burford* doctrine to administrative enforcement actions,

although that is certainly the area in which abstention is most prevalent. Citing *MLC Auto., LLC v. Town of S. Pines,* 532 F.3d 269, 282 (4th Cir. 2008), Defendants also assert that "*Burford* abstention is only applicable 'when the claim is really "state law in federal law clothing."'" ECF 30 at 14. That assertion stretches *MLC* beyond its fair reading, which simply notes that *Burford* abstention is "consistently" deemed appropriate where a claim involves "state law in federal law clothing." 532 F.3d at 282. Defendants' reading is illogical because it would prohibit federal courts from abstaining in diversity cases presenting quintessential issues of state law, where the potential state interest is strongest. No "federal law clothing" is required.

Defendants raise the fair point that the City itself risks disrupting Maryland's efforts to have a coherent online gambling policy in having enacted the CPO to impose its own, more stringent local restrictions. ECF 30 at 10 n.4, 11. But removing this lawsuit essentially asks this federal court to put its thumb on the scale regarding the City's efforts to alter Maryland's online gambling regulatory framework. By defining, in the first instance, the meaning of terms like "unfair" and "deceptive" in the context of the growing market of online gambling, this Court would be removing those decisions from the purview of the state courts before they have had any opportunity to weigh in on the CPO. And, if this Court ultimately were to conclude that conduct is permitted by the state regulations but violates the CPO, a dilemma would ensue – Maryland would either be left with a non-coherent policy where certain conduct is lawful in some parts of the state but not in Baltimore City, or Maryland would have to impose new statewide restrictions comporting with this Court's determination and the City's view of fair trade practices. Maryland's state courts are far better equipped to address, in the first instance, the complex state law issues and interests presented in this scenario. *See Burford,* 319 U.S. at 332 ("These questions of

regulation of the industry . . . so clearly involve[] basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them.").

Defendants also appropriately note that, at the time the federal case was pending in *Johnson,* there were also ongoing proceedings before the South Carolina Supreme Court presenting similar issues. There are no such parallel proceedings here. Nevertheless, while that factor was referenced as "of especial significance" in Judge Luttig's concurrence, *Johnson,* 119 F.3d at 731 (Luttig, J., concurring), the Fourth Circuit majority did not rely on it in its analysis. The majority simply noted that, by the time of the appeal, the state court had ruled on the same issues and "declined to go so far as" the federal court on the unfair competition issue, highlighting the danger of a federal court being the first to decide a legal issue of such importance to state policy and "underscor[ing] the propriety of abstention in the first place." *Id.* at 721.

This Court agrees wholeheartedly with Defendants that federal courts should not invoke *Burford* abstention simply because a case involves gambling or some other highly regulated industry. There is no such bright line rule established in *Johnson* or anywhere else. Equally, there is no bright line rule that *Burford* abstention applies every time a case involves a newly enacted state or local law. But this case presents a confluence of factors that, when taken together, warrant abstention. This Court is being asked to answer disputed questions of state law, namely delineating the proper interpretation of "unfair" and "deceptive" conduct in the context of marketing for sports betting, an issue that "powerfully impacts" the welfare of Maryland's citizens. And granting the relief sought would "effectively establish parallel federal and state oversight" of sports gambling in Maryland because the federal standard would govern in Baltimore City and the state standard would apply in the remainder of Maryland's jurisdictions. This case presents an uncharted issue of state law interpreting a new local statute in the context of a civil enforcement action brought by

that local jurisdiction, substantial public policy concerns about the boundaries of marketing a multi-million-dollar industry, and the gambling-specific "police power" factors that contributed to abstention in *Johnson*. Maryland needs to determine, through its courts or otherwise, how it will formulate coherent sports betting policy either in spite of, or working with, the City's unique interests and concerns. It is not the place of the federal courts to be dictating, manning, or influencing how those jurisdictions work through that process, given the limited or nonexistent federal interest. Accordingly, this is one of the extraordinary and narrow circumstances in which *Burford* abstention is warranted.

## III.    CONCLUSION

For the reasons set forth above, Defendants' motion for surreply, ECF 45, and the City's motion to remand, ECF 19, will both be GRANTED. This case will be REMANDED to the Circuit Court for Baltimore City. A separate Order follows.


Dated:  November 10, 2025                          _____/s/_____
                                                   Stephanie A. Gallagher
                                                   United States District Judge